PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  09-1921, 09-2989 & 09-2991

_____

JOEL S. ARIO,
Insurance Commissioner of the
Commonwealth of Pennsylvania,
in his official capacity as the statutory liquidator
of Legion Insurance Company (in liquidation);
*PEPPER HAMILTON, LLP,

Appellant (09-1921)

v.

THE UNDERWRITING MEMBERS OF SYNDICATE
53 AT LLOYDS FOR THE 1998 YEAR OF ACCOUNT

Cross-Appellants (09-2991)
*(Pursuant to F.R.A.P. 12(a) (09-2989 only))

_____

No.  09-1922, 09-2990 & 09-2992

_____

JOEL S. ARIO,
Insurance Commissioner of the

Commonwealth of Pennsylvania,
in his official capacity as the statutory liquidator
of Villanova Insurance Company (in liquidation);
*PEPPER HAMILTON, LLP,

Appellant (09-1922)

v.

THE UNDERWRITING MEMBERS OF SYNDICATE
53 AT LLOYDS FOR THE 1998 YEAR OF ACCOUNT

Cross-Appellants (09-2992)
*(Pursuant to F.R.A.P. 12(a) (09-2990 only))

———————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 1–08-cv-01619/20)
District Judge: Honorable William W. Caldwell

———————

Argued March 10, 2010

———————

Before: AMBRO, SMITH, and ALDISERT, <u>Circuit Judges</u>

Opinion filed: August 18, 2010

Deborah F. Cohen, Esquire (Argued)
Joann Hyle, Esquire
Kassem Lucas, Esquire
Thomas B. Schmidt, III, Esquire
Pepper Hamilton
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA  19103-2799

      Counsel for Appellant/Cross-Appellee
      Joel S. Ario

Nancy J. Gellman, Esquire (Argued)
Conrad O'Brien PC
1515 Market Street, 16th Floor
Philadelphia, PA  19102

      Counsel for Appellant
      Pepper Hamilton LLP

Joseph M. Donley, Esquire
Thorp, Reed & Armstrong
One Commerce Square
2005 Market Street, Suite 1000
Philadelphia, PA  19103-0000

David M. Raim, Esquire (Argued)
Chadbourne & Parke
1200 New Hampshire Avenue, N.W.
Washington, DC  20036-0000

Counsel for Appellees/Cross-Appellants
of Syndicate 53

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

We confront here the interplay between the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), *adopted* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3, and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* We also address the propriety of sanctions awarded in the related litigation. For the reasons that follow, we affirm the judgments of the District Court confirming the arbitration award and denying one of the requested Rule 11 sanctions, but we reverse its judgment awarding the other Rule 11 sanction.

## I.      Factual and Procedural History

### A.      The reinsurance treaties

Two Pennsylvania insurers, Legion Insurance Company and Villanova Insurance Company (collectively, the "primary

insurers"), entered into reinsurance treaties[1] with the Underwriting Members of Syndicate 53 at Lloyd's for the 1998 Year of Account (the "reinsurers").[2] The primary insurers are now in liquidation, and they are represented in these actions by their statutory liquidator, Joel S. Ario, the Insurance Commissioner for the Commonwealth of Pennsylvania.[3]

---

[1] Reinsurance treaties are a type of reinsurance contract. A treaty reinsurer agrees to accept and insure an entire block of insurance business (both existing policies and "as yet unwritten" policies). Instead of assessing the individual, existing risks being reinsured, the reinsurer evaluates the overall risk of the pool that is to be reinsured as the policies are written. Thus, any representations by the primary insurer about the pool of risks are material to the reinsurer's decision to reinsure the block of business.

This is in contrast to facultative reinsurance, where a reinsurer assesses the characteristics of each policy to determine whether to reinsure the individual risks as presented. *See generally N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1198–1200 (3d Cir. 1995) (explaining the difference between treaty reinsurance and facultative reinsurance).

[2] The reinsurers are a Lloyd's syndicate that underwrote insurance and reinsurance business in London, England. The individuals comprising the syndicate predominantly live abroad, largely within the United Kingdom.

[3] Outside of this section, we refer to the primary insurers and the Commissioner collectively as "Ario" when addressing their

5

Four reinsurance treaties are at issue here, all with identical language in the relevant provisions, differing only in the limits and types of coverage provided. The first relevant provision governs arbitration, and it is reproduced here in its entirety:

### **ARBITRATION**

As a condition precedent to any right of action hereunder, any dispute or difference between the [primary insurers] and the Reinsurers relating to the interpretation or performance of this Agreement, including its formation or validity, or any transaction under this Agreement, whether arising before or after termination, shall be submitted to binding arbitration, with the exception of matters requiring resolution by way of injunctive relief.

Upon written request of any party, each party shall choose an arbitrator and the two chosen shall select a third arbitrator. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of the written request for arbitration, the requesting party may appoint a second arbitrator. If the two arbitrators fail to

---

arguments.

6

agree on the selection of a third arbitrator within thirty (30) days of their appointment, each of them shall name three individuals, of whom the other shall decline two, and the selection of the third arbitrator from those remaining named individuals shall be named by the Federal District Court for the Eastern District of Pennsylvania. All arbitrators shall be disinterested in the outcome of the arbitration. Each party shall submit its case to the arbitrators within thirty (30) days of the appointment of the third arbitrator.

The parties hereby waive all objections to the method of selection of the third arbitrator, it being the intention of both sides that the third arbitrator be chosen from those submitted by the parties.

The arbitrators shall have the power to determine all procedural rules for the holding of the arbitration[,] including but not limited to inspection of documents, examination of witnesses[,] and any other matter relating to the conduct of the arbitration. The arbitrators shall interpret this Agreement as an honorable engagement and not as merely a legal obligation, they are relieved of all judicial formalities and may abstain from following the strict rules of law. The arbitrators may award interest and costs, but in no event shall punitive or exemplary damages

be awarded. Each party shall bear the expense of its own arbitrator and shall share equally with the other party the expense of the third arbitrator and of the arbitration.

Arbitration hereunder shall take place in Philadelphia, Pennsylvania unless both parties otherwise agree. Except as hereinabove provided, the arbitration shall be in accordance with the rules and procedures established by the Uniform Arbitration Act as enacted in Pennsylvania.

J.A. 141, 156, 173, 187. The second relevant provision is the service-of-suit provision, reproduced in part below:

**SERVICE OF SUIT CLAUSE (USA) - NMA 1998**

It is agreed that in the event of the failure of Reinsurers hereon to pay any amount claimed to be due hereunder, the Reinsurer hereon, at the request of the Reinsured, will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Reinsurers' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a

case to another Court as permitted by the laws of the United States or of any State in the United States.

J.A. 142, 156, 173, 188.

## B.    The coverage dispute and arbitration

Years after the reinsurance treaties were signed, a dispute arose between the primary insurers and the reinsurers. The reinsurers asserted that the primary insurers were not underwriting the business as described in the initial placement materials (*i.e.*, the pool risks were not what the reinsurers expected them to be based on the primary insurers' prior representations). The reinsurers alleged that the primary insurers underwrote their business in a manner that, while increasing premium volume for the primary insurers, also exposed the reinsurers to increased risk. A September 2005 audit by the reinsurers purportedly exposed these problems.

The reinsurers argued that they had suffered substantial losses as a result of the primary insurers' misconduct, and they refused to pay the claims of the primary insurers. The primary insurers responded by demanding arbitration on September 18, 2006, in the hope of recovering their share of losses under the reinsurance treaties (*i.e.*, what the primary insurers believed was owed to them by the reinsurers under the treaties).

The parties agreed that the dispute was arbitrable, and

they proceeded to arbitration. The primary insurers asked the arbitration panel to award it the full amount due under the reinsurance treaties, plus interest. The reinsurers argued that the treaties should be rescinded (and thus, their obligations to pay the primary insurers extinguished) based on eight separate legal theories.[4] The primary insurers denied the contentions. Broad discovery was conducted, resulting in document production, depositions, and expert reports; the parties submitted briefs; and a nine-day evidentiary hearing was held in which both parties made opening and closing statements, and thoroughly examined and cross-examined 11 witnesses.

The testimony of one witness in particular, Ian Crane, though only a small part of the arbitration proceedings, factors prominently in our case. Crane was an employee of the managing agent for the reinsurers, and he participated in the underwriting of the treaties at issue here. He testified to the circumstances under which he received the placement materials from the primary insurers and the effect of those materials on

---

[4] The eight theories were: (1) material misrepresentation under English law; (2) material non-disclosure under English law; (3) breach of the duty of utmost good faith under English law; (4) intentional misrepresentation or omission under Pennsylvania law; (5) negligent misrepresentation or omission under Pennsylvania law; (6) breach of the duty of utmost good faith under Pennsylvania law; (7) breach of the implied duty of good faith and fair dealing under Pennsylvania law; and (8) breach of contract under Pennsylvania law.

10

underwriting. However, he did not specifically recall the precise communications between the primary insurer and the reinsurers, and he did not recall his exact knowledge and thoughts at the time of the reinsurance underwriting. Instead, he based his testimony on documents (including three documents that are not part of or cited in the reinsurance treaties, but are communications between the primary insurers and the reinsurers and their agents)[5] that he saw years ago during the placement process.

Following the discovery, briefing, and evidentiary hearing, the arbitration panel issued an award rescinding three of the four treaties. On the rescinded treaties, the reinsurers were relieved of any obligation to pay losses owing; on the remaining treaty, the reinsurers were ordered to pay losses owing. This award was a so-called unreasoned award, as the panel neither provided the rationale for its decision nor gave any indication of the evidence on which its decision was based.

---

[5] These three documents are: (1) a submission from the primary insurer to prospective reinsurers about how the primary insurer was to underwrite the business to be ceded to the reinsurers; (2) a marked-up October 1998 fax to a reinsurer about how the primary insurer allocated premiums; and (3) a November 1998 fax to Mr. Crane explaining differences between the reinsurance treaties at issue in this case and other reinsurance contracts not at issue here.

11

## C.      Post-arbitration litigation

The primary insurers have been in liquidation proceedings in the Commonwealth Court of Pennsylvania since mid-2003. Following the arbitration award, on August 6, 2008, Ario (as liquidator on behalf of the primary insurers) filed a motion to confirm in part, and to vacate in part, the award as part of the liquidation proceedings. Shortly thereafter, the reinsurers removed the case to the District Court for the Eastern District of Pennsylvania pursuant to the removal provision in 9 U.S.C. § 205,[6] and filed a motion to confirm the award. The

---

[6] The removal provision reads:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal. For the purposes of Chapter 1 of this title any action or proceeding removed under this section shall be deemed to have been

12

parties do not dispute that the award falls under the Convention; they part on whether the FAA and Convention's enabling legislation contained in Chapter 2 of the FAA applies (including 9 U.S.C. § 205).[7]  *See* 9 U.S.C. § 202; *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 449 & n.13 (3d Cir. 2003) (listing four factors to determine whether an arbitration agreement falls under the Convention).

On September 29, 2009, Ario filed a motion to remand the case to state court, which the reinsurers opposed.  Ario's motion was premised on the argument that the parties had selected the Pennsylvania Uniform Arbitration Act ("PUAA"), 42 Pa. Cons. Stat. § 7301 *et seq.*, to govern the arbitration. Therefore, he argued, the parties had opted out of the FAA in its entirety (including 9 U.S.C. § 205), and the District Court

> brought in the district court to which it is removed.

9 U.S.C. § 205.

[7] To clarify, the Convention and Chapter 2 of the FAA are distinct.  The Convention is the multilateral treaty to which the United States acceded.   Chapter 2 of the FAA is the implementing legislation for the Convention, and it provides the mechanism for enforcement of the Convention in United States courts.   *See* 9 U.S.C. § 201 ("The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.").

13

lacked subject matter jurisdiction. That Court denied the motion to remand in a five-page opinion, "easily conclud[ing]" that it had jurisdiction over the case pursuant to § 205 because the case related to an arbitration award falling under the Convention. It reasoned that (1) the authority cited by Ario did not address the Court's jurisdiction, and (2) Ario had "not even attempt[ed] to address why [it] lack[ed] jurisdiction under the real test for making that determination."

Having failed in his attempt to remand the case, Ario continued to pursue his motion to vacate the award (in opposition to the reinsurers' motion to confirm the award). He argued that the parties had opted out of FAA vacatur standards in favor of the standards set forth by the PUAA. Applying his interpretation of the PUAA vacatur standards, he urged that the award be vacated based on perceived weaknesses in Mr. Crane's testimony and other documentary evidence. The District Court denied Ario's motion to vacate the award and granted the reinsurers' motion. It concluded that review was governed by the FAA, not the PUAA. Applying the FAA and confirming the award, it rejected Ario's contention that there was "no evidence" to support the award.

Following the District Court's rulings, the reinsurers moved for sanctions pursuant to Federal Rule of Civil Procedure 11 against Ario and his counsel, Pepper Hamilton, for both (1) the motion to remand, and (2) the motion to vacate the award. The District Court granted the motion in part and denied it in part. Finding "no basis in existing law for [Ario] to assert there

14

was no jurisdiction," and noting that Ario did not argue that "he was trying under Rule 11(b)(2) to extend or modify existing law, or create new law," the Court decided that the imposition of attorney's fees was an appropriate sanction. It also determined that the Rule 11 sanction would fall on Ario's attorneys alone (and not on Ario). However, the District Court did not find a Rule 11 violation on account of the filings contesting the arbitration award because, in the Court's view, it was "legally and objectively reasonable" for Ario to challenge the award on the basis that Mr. Crane had no personal recollection of the circumstances leading up to the reinsurance agreements.

These consolidated cross-appeals followed.

## II.     Jurisdiction and Standards of Review

As we explain below, the District Court had jurisdiction under 9 U.S.C. §§ 203 and 205. We have jurisdiction over the consolidated appeals under 28 U.S.C. § 1291.

We exercise plenary review over the denial of a motion to remand to the extent that the underlying basis is a legal question, as it is here. *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 665 (3d Cir. 2002). In reviewing a district court's order confirming an arbitration award, we assess its factual findings for clear error and its legal conclusions *de novo*. *China Minmetals Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 278 (3d Cir. 2003).

15

We review a district court's decision to grant or deny Rule 11 sanctions for abuse of discretion. *Simmerman v. Corino*, 27 F.3d 58, 61 (3d Cir. 1994). This means "we evaluate the court's factual determinations, legal conclusions, and choice of an 'appropriate sanction' with substantial deference, considering not whether we would make the same precise determinations, but only whether those determinations are contrary to reason or without a reasonable basis in law and fact." *Id.* at 62. An example of abuse of discretion occurs when a district court "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (citation omitted) (internal quotation marks omitted).

## III.   Analysis

### A.   Removal to federal court was proper under 9 U.S.C. § 205

While Ario agrees that the award is subject to the Convention, he argues that the parties "agreed to waive Chapter 2 of the FAA [the Convention's implementing legislation] in its entirety," precluding removal of this case to federal court. Citing to Supreme Court and Third Circuit cases, his argument essentially has two prongs: (1) the parties can (and did) "opt out" of the entire FAA such that they are not subject to its strictures; and (2) even if the FAA applies, the arbitration provisions here included a clear and unequivocal expression of intent to opt out of the removal provision in § 205. We disagree.

16

### 1. Parties cannot "opt out" of the FAA and the Convention's implementing legislation

Ario argues that the language in the reinsurance treaties referencing the PUAA supplanted the FAA in its entirety. But though the FAA allows parties to choose state-law arbitration standards, they cannot "opt out" of the FAA. Accordingly, the parties here could not have "opted out" of the FAA, notwithstanding language that refers to the PUAA in the reinsurance treaties.

The FAA is divided into three chapters, two of which are implicated here. Chapter 1 (the "domestic FAA"), 9 U.S.C. §§ 1–16, is a set of default rules "designed 'to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate.'" *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989). Chapter 2 (the Convention's implementing legislation), 9 U.S.C. §§ 201–08, by contrast, is intended "'to secure for United States citizens predictable enforcement by foreign governments of certain arbitral contracts and awards made in this and other signatory nations.'" *Suter v. Munich Reins. Co.*, 223 F.3d 150, 154 (3d Cir. 2000) (citation omitted).

The domestic FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt*, 489 U.S. at 478 (citations omitted). It "does not . . . prevent[] the enforcement of

17

agreements to arbitrate under different rules than those set forth in the [domestic FAA] itself." *Id.* at 479. Thus, when "parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA." *Id.*

We have interpreted the FAA and *Volt* to mean that "parties [may] contract to arbitrate pursuant to arbitration rules or procedures borrowed from state law, [and] the federal policy is satisfied so long as their agreement is enforced." *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 292 (3d Cir. 2001) (citing *Volt*, 489 U.S. at 478), *abrogated in part on other grounds by Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 583 n.5 (2008).

This is not because the agreements "cease being subject to the FAA," but is instead because "the FAA permits parties to 'specify by contract the rules under which . . . arbitration will be conducted.'" *Id.* (quoting *Volt*, 489 U.S. at 479). Thus, enforcement of an agreement to use state rules and procedures in lieu of the federal default rules is "not because the parties have chosen to be governed by state rather than federal law," but "because *federal law* requires that the court enforce the terms of the agreement." *Id.* (emphasis in original). But while parties may opt out of the FAA's default rules, they cannot "opt out" of FAA coverage in its entirety because it is the FAA itself that authorizes parties to choose different rules in the first place.

Although *Volt* and *Roadway* addressed only the domestic

18

FAA, the principles undergirding those decisions apply to the Convention's implementing legislation. An agreement by parties to apply the rules and procedures of state law neither operates as an "opt out" of the domestic FAA nor as an "opt out" of the Convention's implementing legislation. It is federal law that allows the parties to make and enforce agreements that fall under the FAA or the Convention. Accordingly, we reject Ario's argument that the FAA, in its entirety, is inapplicable here.

> **2.** **The parties did not clearly and unambiguously agree to waive the right of removal**

Though the parties may not opt out of (and are governed by) the FAA, it is still possible to waive specifically the right of removal under 9 U.S.C. § 205. *See Suter*, 223 F.3d at 158. Though not discussed by the parties or the District Court in the prior proceedings, on appeal the parties acknowledge controlling precedent on the question of whether a right of removal under § 205 may be waived by agreement of the parties. In *Suter*, we noted the "strong and clear preference for a federal forum, a policy that will be best served by resolving any ambiguity in contract language against waiver" of the right of removal. *Id.* We therefore applied a strict standard, holding that "there can be no waiver of a right to remove under the Convention Act [*i.e.*, 9 U.S.C. § 205] in the absence of clear and unambiguous language requiring such a waiver." *Id.*

19

*Suter* involved a service-of-suit provision in which a party had agreed to "submit to the jurisdiction of any Court of competent jurisdiction within the United States." *Id.* at 153. We held that provision to be ambiguous with respect to the question of a § 205 waiver because the "service of suit clause does not explicitly waive removal rights, and a defendant may remove a case 'after submitting to the jurisdiction of [the state] courts and complying with all necessary requirements to give [the state] courts power over the suit,' as required by the service of suit clause." *Id.* at 160 (alterations in original) (citation omitted). Indeed, because "'[a]ll matters would be determined in accordance with the practice and law of the court chosen by [the plaintiff] in the sense that all state courts follow the removal law established by Congress,'" the right of removal was consistent with the contractual language. *Id.* (alterations in original) (citation omitted).

We are aware of only one decision from our sister circuit courts that has found a clear and unambiguous waiver of the right to remove pursuant to § 205. *See Ensco Int'l, Inc. v. Certain Underwriters at Lloyd's*, 579 F.3d 442 (5th Cir. 2009). There, a divided panel of the Court of Appeals for the Fifth Circuit[8] held that a choice-of-law provision in an insurance

---

[8] There were three separate opinions in *Ensco*, with the two members of the majority applying different reasoning to reach the same result. *See Ensco*, 579 F.3d at 443 (Smith, J.); *id.* at 449 (Owen, J., concurring in the judgment); *id.* at 450 (Jolly, J., dissenting).

policy met the clear and unambiguous standard where the parties agreed that "[a]ny disputes arising under or in connection with [the insurance policy] shall be subject to the *exclusive jurisdiction* of the Courts of Dallas County, Texas." *Id.* at 443 (emphasis added). The judges in the majority each found the words "exclusive jurisdiction" to be sufficiently express, clear, and unambiguous to be a waiver of § 205 rights. *Id.* at 448–49 (Smith, J.); *id.* at 450 (Owen, J., concurring in the judgment). Any other interpretation would "read the word 'exclusive' out of the contract," *id.* at 449 (Smith, J.), and ignore the "well-understood" meaning of "exclusive," *id.* at 450 (Owen, J., concurring in the judgment).

Ario contends that there is similar "clear and unambiguous" language in the reinsurance treaties' arbitration provisions expressing the parties' agreement to waive the right of removal. He argues that because the parties agreed that "the arbitration shall be in accordance with the rules and procedures established by the [PUAA]," this waived the reinsurers' (and Ario's) right to remove to federal court under § 205.

We disagree that this was sufficiently clear and unambiguous to effect a waiver. Not only do the arbitration provisions not make any mention of removal, the lone provision in the reinsurance treaties to refer to removal, the service-of-suit provision, explicitly states that "[n]othing in [it] constitutes or should be understood to constitute a waiver of Reinsurers' rights . . . to remove an action to a United States District Court." Nor is there any language akin to "exclusive jurisdiction" that is

21

fundamentally incompatible with the preservation of the right to remove. Far from expressing a clear and unambiguous waiver of the right to remove, the reinsurance treaties expressly preserve it.

To the extent that Ario argues that this language disavows removal only with respect to anything else in the service-of-suit provision (and not the entire agreement), we disagree. It would be self-defeating, to say the least, for the reinsurers to preserve expressly in one provision what Ario argues they waived implicitly in another. We do not read the agreement to reach that illogical result. We conclude that the parties did not agree to waive their § 205 rights, and thus affirm the District Court's denial of the motion to remand.

## B. The FAA provides the applicable vacatur standards

The parties disagree as to the applicable vacatur standards. Ario argues that the PUAA applies, while the reinsurers argue that the FAA applies. We agree with the reinsurers.

Though this award falls under the Convention, which ordinarily provides extremely limited grounds for vacatur, the FAA provides the applicable (and slightly broader) vacatur standards for this award. We conduct our analysis in two steps: first, we explain why the FAA vacatur standards presumptively apply to Convention awards rendered and enforced in the United

22

States; and second, we determine that the reinsurance treaties do not show the parties' clear intent to substitute the PUAA vacatur standards for those of the FAA.

**1. In the absence of clear intent to the contrary, the FAA's vacatur standards apply to a Convention award rendered and enforced in the United States**

"Under the Convention, a district court's role is limited—it must confirm the award unless one of the grounds for refusal specified in the Convention applies to the underlying award." *Admart AG v. Stephen & Mary Birch Found.*, 457 F.3d 302, 307 (3d Cir. 2006); *see also* 9 U.S.C. § 207. Article V of the Convention sets forth the grounds for refusal,[9] and "courts

---

[9] Article V reads as follows:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes the competent authority where the recognition and enforcement is sought, proof that:

    (a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said

23

agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separate from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure

24

was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

Convention on the Recognition and Enforcement of Foreign

have strictly applied the Article V defenses and generally view[ed] them narrowly." *Admart AG*, 457 F.3d at 308. Accordingly, if vacatur is limited to the grounds listed in the Convention, Ario would have little chance of success. We have recognized, however, that there is "more flexibility . . . when the arbitration site and the site of the confirmation proceeding were within the same jurisdiction." *Id.* (citing *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22–23 (2d Cir. 1997)).

In *Yusuf*, the Court of Appeals for the Second Circuit concluded that there are "very different regimes for the review of arbitral awards (1) in the [country] in which, or under the law of which, the award was made, and (2) in other [countries] where recognition and enforcement are sought." 126 F.3d at 23. After conducting a thorough analysis of both regimes, it concluded that the FAA's vacatur standards applied to the Convention award it was reviewing because the arbitration award was made in the United States. *Id.*

We previously adopted the second portion of *Yusuf* in *Admart AG*, "'holding that, in an action to confirm an award rendered in, or under the law of, a foreign jurisdiction, the grounds for relief enumerated in Article V of the Convention are the only grounds available for setting aside an arbitral award.'"

---

Arbitral Awards art. V, *adopted* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3; *see also Admart AG*, 457 F.3d at 307–08.

26

457 F.3d at 308 (quoting *Yusuf*, 126 F.3d at 20). We therefore looked only to the limited Article V grounds when reviewing a "foreign" Convention award. But unlike *Admart AG*, in this case the Convention award was rendered in the United States. Therefore, we must decide whether to adopt the first portion of the *Yusuf* decision and its articulation of the available grounds for vacating a Convention award rendered in the United States.

The *Yusuf* Court held that, "under Article V(1)(e) [of the Convention], the courts of the United States are authorized to apply United States procedural arbitral law, i.e., the [domestic] FAA, to nondomestic [Convention] awards rendered in the United States."[10] 126 F.3d at 19–20; *see also* Convention Art. V(1)(e) ("Recognition and enforcement of the award may be refused . . . [if the award] has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."). Accordingly, the *Yusuf* Court concluded, "[t]he Convention specifically contemplates that the [country] in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and

---

[10] A "nondomestic" award is an award that is "subject to the Convention not because [it was] made abroad, but because [it was] made within the legal framework of another country, e.g., pronounced in accordance with foreign law or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction." *Yusuf*, 126 F.3d at 19 (citation omitted) (internal quotation marks omitted).

27

implied grounds for relief." 126 F.3d at 23. We agree with this interpretation, and now adopt it.

This reasoning is also consistent with 9 U.S.C. § 208, also part of the Convention's implementing statute, in which Congress explicitly provided for the application of the domestic FAA to the extent that it did not conflict with the Convention. *See* 9 U.S.C. § 208 ("Chapter 1 [of the FAA] applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States."). When both the arbitration and the enforcement of an award falling under the Convention occur in the United States, there is no conflict between the Convention and the domestic FAA because Article V(1)(e) of the Convention incorporates the domestic FAA and allows awards to be "set aside or suspended by a competent authority of the country in which . . . that award was made." Here, because the arbitration took place in Philadelphia, and the enforcement action was also brought in Philadelphia, we may apply United States law, including the domestic FAA and its vacatur standards.

## 2. There was no clear intent to apply the PUAA vacatur standards

As discussed above, the domestic FAA allows parties to agree to apply state law enforcement mechanisms in lieu of the FAA default rules. Of course, "[t]he FAA is not the only way into court for parties wanting review of arbitration awards," and

28

parties "may contemplate enforcement under state statutory or common law." *Hall St. Assocs.*, 552 U.S. at 590.[11] "[T]he FAA standards control 'in the absence of contractual intent to the contrary.'" *Roadway*, 257 F.3d at 296 (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 59 (1995)).

We require the parties to express a "clear intent" to apply state law vacatur standards instead of those of the FAA. *See id.* at 288, 293, 295. We chose the "clear intent" standard because it furthered the FAA's goal of enforcing parties' actual bargains, and we concluded that the default application of the FAA caused fewer problems than application of other standards in the absence of "clear intent." *Id.* at 296 ("We must, therefore, decide which error is worse: wrongly concluding that parties

---

[11] Ario argues that *Hall Street* supports his position. We disagree. In *Hall Street* the Supreme Court addressed only the narrow question of whether parties could agree to modify the FAA's confirmation, vacatur, and modification standards (listed in 9 U.S.C. §§ 9, 10 and 11), concluding that they "provide exclusive regimes for the review provided by statute," and thus could not be altered by the parties. 552 U.S. at 590. However, the Court noted that it "sp[oke] only to the scope of the expeditious judicial review under [those sections], [and] *decid[ed] nothing about other possible avenues for judicial enforcement of arbitration awards.*" *Id.* (emphasis added). Thus, *Hall Street* says nothing about using the alternate avenue of 9 U.S.C. § 205 for judicial enforcement of an arbitration award falling under the Convention, and does not support Ario's arguments that the FAA is entirely displaced.

intended to opt out, or wrongly concluding that they did not. In light of the FAA's history, we believe that the former is worse than the latter."). Thus, the parties here must show "clear intent" to apply the PUAA vacatur standards in order to displace those of the FAA. We also noted in a *dictum* that "[i]t is not particularly difficult, for example, to provide that 'any controversy shall be settled by arbitration in accordance with the terms of the [PUAA].'"[12] *Id.* at 297. We observed that this would impose "minuscule transaction costs."[13] *Id.*

In applying the "clear intent" standard, we look to the reinsurance treaties to determine what the parties actually agreed to use as the vacatur standards. Again, of particular importance are the arbitration provisions and the service-of-suit provision. We conclude that while there is a plausible argument that the parties may have agreed to apply PUAA standards, it falls short of the "clear intent" we demand.

---

[12] The suggested language in *Roadway*, however, did not represent magic words. 257 F.3d at 297 n.5 ("We do not mean to suggest that parties may not be found to have opted out unless their contract includes a statement such as this one. We only hold that a generic choice-of-law clause, standing alone, raises no such inference.").

[13] Importantly, there is no requirement that a party wishing to remain under the FAA vacatur standards affirmatively express that intent, as in *Roadway* we presumed that the parties intended *not* to opt out of the FAA standards. 257 F.3d at 297.

Ario relies on language in the reinsurance treaties that resembles language we suggested (in the *Roadway dictum* noted above) might satisfy the "clear intent" standard: "the arbitration shall be in accordance with the rules and procedures established by the [PUAA]." J.A. 141, 156, 173, 187. Standing alone, this might suggest that the parties agreed to use the PUAA vacatur standards. However, this is not the only sentence in the arbitration provisions of, nor does it contradict other sentences in, the reinsurance treaties relating to the enforcement of any resulting award.

For example, the reinsurance treaties contain a service-of-suit provision. As we recently observed, "service-of-suit [provisions] . . . complement arbitration clauses by establishing a judicial forum in which a party may enforce arbitration." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 554 (3d Cir. 2009). The reinsurers contend that the service-of-suit provision here is "the only provision to address judicial enforcement of the parties' rights." (Reinsurers' Br. at 26 (emphasis in original).) While we may not agree that it is the only such provision, it does specifically refer to enforcement of the arbitration award in state and federal courts. *See* J.A. 142, 156, 173, 188 ("[I]n the event of the failure of Reinsurers hereon to pay any amount claimed to be due hereunder, the Reinsurer . . . will submit to the jurisdiction of a Court of competent jurisdiction within the United States."). This provision does not contain any reference to the operative law, but it does address enforcement of any arbitration award by "establishing a judicial forum" for enforcement. Of importance

31

is that it also does not affirmatively elect to apply PUAA vacatur standards in that forum.

By contrast, the arbitration provisions on which Ario relies strongly imply that they are concerned with only the conduct of the arbitration itself, not judicial enforcement of a resulting award. The five paragraphs of arbitration provisions go into great detail as to the scope of the arbitrators' power, the selection of the arbitrators, the procedural rules for conducting the arbitration, an "honorable engagement" section casting aside judicial formalities, limits to the types of damages, and the site of arbitration. Reading the last paragraph of the arbitration provisions in this context leads us in the majority to conclude that they address solely the "rules and procedures" applicable to the conduct of the arbitration, not its enforcement (*i.e.*, the applicable vacatur standards).[14]

---

[14] Although our colleague has written a thoughtful dissent, we believe he has read too much into the arbitration provision by appending the end of the last sentence of the fifth paragraph of the five-paragraph arbitration provision to the middle of the first sentence of the first paragraph of that provision. However, the term "rules and procedures" does not modify "any dispute or difference," but instead modifies "arbitration." *See* J.A. 141, 156, 173, 187 ("[T]he *arbitration* shall be in accordance with the rules and procedures established by the [PUAA]." (emphasis added)). As we have stated, there is a difference between the conduct of an *arbitration proceeding* and the enforcement of a resulting *award*.

The structure of the PUAA reflects this dichotomy between the arbitration and the resulting award. Sections 7305–12 of the PUAA address the "rules and procedures" for the conduct of arbitration, including: the selection of arbitrators; the quorum of arbitrators; the conduct of the arbitration proceeding; the representation of parties by attorneys in the arbitration proceeding; the presentation of witnesses, subpoenas, oaths, and depositions in the arbitration proceeding; the form of the award of the arbitrators; the power of arbitrators to change their award; and the fees and expenses of the arbitration proceeding. Each of these sections is concerned with the nuts-and-bolts of the arbitration, not *ex post* enforcement of the resulting award.

By contrast, as made plain by the PUAA, "a court . . . review[s] an arbitration *award*," 42 Pa. Cons. Stat. § 7302(d)(2) (emphasis added), but it does not conduct the arbitration. Sections 7313–20 of the PUAA address the role of the court in reviewing the award that results from an arbitration proceeding, including: confirmation of an award by a court; vacating an award by a court; modifying or correcting an award by a court; judgments or decrees on an award by a court; the form and service of applications to a court; the meaning of "court" and "jurisdiction"; the venue of court proceedings; and appeals from court orders. Each of these sections is concerned not with the out-of-court *arbitration*, but instead with the in-court confirmation, vacatur, or modification of a resulting *award*.

We presume the parties knew what they were doing when they chose the word "arbitration" and not "award," and

33

As previously stated, we err on the side of concluding that parties do not intend to opt out of the FAA scheme. In the face of the reasonable inferences that (1) the arbitration provisions were concerned solely with the conduct of the arbitration itself, and (2) the service-of-suit provision was concerned with judicial enforcement of any arbitration decision, we believe that the parties did not have a "clear intent" to apply the PUAA vacatur standards in lieu of the FAA standards. We thus apply the FAA's vacatur standards and not those of the PUAA.

---

we conclude that, by speaking only to "the arbitration," the parties here did not clearly intend to apply PUAA vacatur standards to the resulting award. Simply put, vacatur is not arbitration.

We also disagree strongly that we are allowing a service-of-suit provision to override what our colleague believes to be the "wholesale adoption . . . of the PUAA." In *Century Indemnity*, we did indeed state that "service-of-suit clauses do not negate accompanying arbitration clauses." 584 F.3d at 554. However, this was not in the context of selecting vacatur standards—it dealt with whether the dispute was arbitrable at all. *See id.* ("Century also argues that the . . . service-of-suit clause indicates that disputes between the parties should be resolved exclusively in the courts."). Here, we have not negated an agreement to arbitrate; quite the contrary, we actually enforce the arbitration award. We hold only that the parties here did not clearly intend to apply PUAA vacatur standards to the resulting award.

34

### C. The award is confirmable under the FAA vacatur standards

Ario argues that, even if the FAA vacatur standards apply, the arbitration panel had no ground on which to base its interpretation of the reinsurance treaties and "exceeded [its] powers." Because Mr. Crane did not personally recall the negotiations that led to the underwriting, Ario argues, the arbitration award must be vacated because it is "irrational." Applying the FAA's vacatur standards, we disagree and affirm the District Court's judgment confirming the award.

### 1. The FAA vacatur standards

Vacatur under the FAA is governed by 9 U.S.C. § 10. If the FAA's vacatur standards apply, as they do here, these are the only grounds that can support vacatur. *See Hall St.*, 552 U.S. at 590. Four narrow grounds are provided in the statute:

> In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
>
> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of

them;

(3)     where the arbitrators were guilty of
        misconduct in refusing to postpone the
        hearing, upon sufficient cause shown, or in
        refusing to hear evidence pertinent and
        material to the controversy; or of any other
        misbehavior by which the rights of any
        party have been prejudiced; or

(4)     where the arbitrators exceeded their
        powers, or so imperfectly executed them
        that a mutual, final, and definite award
        upon the subject matter submitted was not
        made.

9 U.S.C. § 10(a).

The sole basis Ario asserts for vacation of the award is
"irrationality," and he makes no contention of any corruption,
fraud, partiality, or misconduct (the first three grounds). The
"irrationality" standard comes from the fourth ground, the
"exceeded their powers" provision. *See Mut. Fire, Marine &
Inland Ins. Co. v. Norad Reins. Co.*, 868 F.2d 52, 56 (3d Cir.
1989) (noting that the "court's function in confirming or
vacating a commercial [arbitration] award is severely limited"
and interpreting what is now § 10(a)(4) (alteration in original)
(citation omitted) (internal quotation marks omitted)). We
review the form of the relief awarded by the arbitrators to

36

"determine if the form of the arbitrators' award can be rationally derived either from the agreement between the parties or from the parties['] submissions to the arbitrators," and we do not revise the terms of the award "unless they are 'completely irrational.'" *Id.* (citation omitted).

So deferential is the "irrationality" standard under the FAA that we "may not overrule an arbitrator simply because [we] disagree . . . . [T]here must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award." *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995) (citations omitted) (internal quotation marks omitted). It "should be clear that the test used to probe the validity of a[n] . . . arbitrator's decision is a singularly undemanding one." *Id.* (citation omitted) (internal quotation marks omitted). Conversely, Ario faces a steep uphill battle to show that the arbitration award rendered here was completely irrational and could not be supported on any theory of relief.

### 2.      Vacatur is not warranted

Ario contends that the award must be vacated because Mr. Crane's testimony and the reinsurers' other "immaterial" documentary evidence[15] qualify only as "non-evidence."

---

[15] Ario is apparently referring to the communications between the primary insurers and the reinsurers (and their agents).

37

(Appellant's Br. at 59.)  Notably, he does not argue that there was an actual lack of testimony or evidence, but claims that "it was as if [the reinsurers] had no witness at all to support [their] defense[s]" in response to each of the eight theories they offer (and Ario must disprove) to justify the arbitration award.  (*Id.*)

In essence, Ario's arguments express discontent with the weighing of evidence by the arbitration panel.  Their premise is that the evidence uncovered during discovery (including documents, deposition transcripts, and expert reports), the testimony and argument presented to the arbitrators during a nine-day evidentiary hearing, and the substantial briefing submitted by both parties, were not sufficient to justify the award.  Yet Ario has not demonstrated why that voluminous record before the arbitration panel could not rationally lead to the arbitration award on any of the eight theories advanced by the reinsurers; instead, he focuses solely on whether the evidence should have been given any weight at all.

As a reviewing court, we do not act to "correct factual or legal errors made by an arbitrator," and we will uphold an award even if the arbitrator engaged in "improvident, even silly, factfinding," *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 279–80 (3d Cir. 2004) (citation omitted) (internal quotation marks omitted) (applying 9 U.S.C. § 10(a)(4)), so long as the arbitrator did not act "completely irrational[ly]," *Mut. Fire*, 868 F.2d at 56 (internal quotation marks omitted).  While Ario may find the evidence unpersuasive, we cannot say that the arbitration panel was

"completely irrational" in crediting the testimony of Mr. Crane and the other documents presented to the panel that Ario considers to be "non-evidence." Accordingly, we affirm the District Court's confirmation of the arbitration award.

### D.     Rule 11 sanctions were not warranted

We conclude with the parties' cross-appeals regarding Rule 11 sanctions entered against Pepper Hamilton, Ario's counsel. As stated above, the District Court imposed sanctions against the firm for its motion to remand, but declined to impose sanctions for its motion to vacate. Because sanctions were not warranted for the filing of either motion, we reverse the award of sanctions for contesting jurisdiction in the motion to remand, and we affirm the denial of sanctions for the motion to vacate the award.[16]

---

[16] Pepper Hamilton also argues that, because the District Court imposed sanctions after it had already issued a final judgment, the sanctions must be reversed in light of the supervisory rule we announced in *Pensiero*. *See Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 99–100 (3d Cir. 1988) ("[W]e adopt as a supervisory rule for the courts in the Third Circuit a requirement that all motions requesting Rule 11 sanctions be filed in the district court before the entry of a final judgment."); *see also Gary v. Braddock Cemetery*, 517 F.3d 195, 202 (3d Cir. 2008) ("An obvious corollary to requiring parties to file their Rule 11 motion prior to final judgment, . . . is that district courts must resolve any issues about imposition

Rule 11 provides that attorneys may be sanctioned if they, among other things, fail to make a reasonable inquiry into the legal legitimacy of a pleading. Fed. R. Civ. P. 11(b)(2) & (c). A district court must determine whether the attorney's conduct was "objectively reasonable under the circumstances." *Simmerman*, 27 F.3d at 62. Sanctions are to be applied only "in the 'exceptional circumstance' where a claim or motion is patently unmeritorious or frivolous." *Doering v. Union County Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988) (citation omitted). Rule 11's "primary purpose is not 'wholesale fee shifting but [rather] correction of litigation abuse.'" *Id.* (alteration in original) (citation omitted). It "must not be used as an automatic penalty against an attorney or party advocating the losing side of a dispute," and it "should not be applied to adventuresome, though responsible, lawyering which advocates creative legal theories." *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 94 (3d Cir. 1988) (citation omitted).

The District Court granted the motion for Rule 11 sanctions based on Ario's motion to remand, in which he argued that because the *Volt* and *Roadway* decisions allow parties to

_____

of sanctions prior to, or contemporaneously with, entering final judgment. Requiring Rule 11 motions to be filed before final judgment is entered accomplishes nothing unless we are able to resolve any challenge to the grant or denial of Rule 11 sanctions when we rule on the merits of the final judgment."). Because we reverse the sanctions on the merits, we do not reach this issue.

choose the applicable law (and thus opt out of portions of the FAA), by choosing the PUAA the parties had opted out of § 205 as well, divesting the Court of jurisdiction. The District Court found a Rule 11 violation because it believed the cases cited by Ario were "clearly distinguishable," as they did not address jurisdiction or the Convention, only the domestic FAA. In imposing sanctions, the Court found Ario's argument "that the parties' choice of law . . . divested the court of jurisdiction" had "simply no basis in existing law" and was "clearly without merit," though it did not identify any authority to the contrary. J.A. 53–54. It apparently believed that parties could not opt out of § 205 and waive their right to a federal forum.[17]

While the District Court may have distinguished *Volt* and *Roadway* or considered them not on point, that does not make an argument premised on those cases sanctionable under Rule 11. Nothing in those cases expressly forecloses Ario's argument, and though ultimately unpersuasive, it was not "patently unmeritorious or frivolous." With *Volt* and *Roadway* as the only two pole stars for its decision (and in the absence of directly contrary authority), there was equally no basis in existing law for the Court to conclude that parties could *not* opt out of § 205 and divest a federal court of jurisdiction. As noted, Rule 11

---

[17] As discussed above, this is incorrect. Though neither the parties nor the District Court cited to it in that Court's proceedings, we made clear in *Suter* that parties to an arbitration agreement may indeed agree to an enforcement regime that waives removal to federal court under § 205. 223 F.3d at 158.

41

sanctions are reserved for correcting litigation abuse. This was not such an instance. Though we affirm the District Court's denial of the motion to remand, we reverse its decision to grant Rule 11 sanctions for the motion to remand, as the motion to remand was not patently lacking in merit.

The District Court did not award Rule 11 sanctions based on the motion to vacate the award. While we ultimately disagree with Ario's assertion that the PUAA applies here because the language in the reinsurance treaties did not state a clear intent to do so, his argument was not "patently unmeritorious or frivolous." As discussed above, under the FAA parties can indeed opt to apply state vacatur standards instead of federal standards. Likewise, although Ario faced a difficult burden to demonstrate that the award was "completely irrational" under the FAA vacatur standards, the failure to do so does not detract from his non-frivolous argument that the award should be vacated under the PUAA. Viewing the District Court's determinations "with substantial deference" (as we must), *Simmerman*, 27 F.3d at 62, it did not abuse its discretion. Accordingly, we affirm its decision not to award sanctions for the motion to vacate.

\* \* \* \* \*

We affirm the District Court's denial of the motion to remand, its denial of the motion to vacate, and its denial of the motion for sanctions for the filing of the motion to vacate the award. We reverse its grant of the motion for sanctions for the

42

filing of the motion to remand.

Joel S. Ario v. The Underwriting Members of

Syndicate 53 at Lloyd's

Nos. 09-1921/1922/2989/2990/2991/2992

---

ALDISERT, <u>Circuit Judge</u>, dissenting in part.

I am pleased to join Judge Ambro's majority opinion for the Court in most respects, but I would hold that the parties' reinsurance treaties evince a clear intent to adopt the vacatur standards of the Pennsylvania Uniform Arbitration Act. Accordingly, I respectfully dissent from Part III(B) of the Court's opinion.

I.

What divides the panel is a disagreement over which body of law governs judicial review of the disputed arbitration award – whether it be the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, or the Pennsylvania Uniform Arbitration Act ("PUAA"), 42 Pa. Cons. Stat. Ann. §§ 7301-7320. The difference between the scope of judicial review of an arbitration award pursuant to the Federal Arbitration Act and the scope of review available under Pennsylvania law has commanded the

1

attention of this court for over 40 years, ever since 1969, when I authored the primary opinion of the Court in <u>Ludwig Honold Manufacturing Co. v. Fletcher</u>, 405 F.2d 1123 (3d Cir. 1969) (comparing vacatur standards of the FAA with those of PUAA's statutory predecessor). The FAA standards still rigorously limit judicial intervention, requiring challengers to show the award was "completely irrational," a near prohibitive burden. <u>Mut. Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.</u>, 868 F.2d 52, 56 (3d Cir. 1989); <u>see also</u> 9 U.S.C. § 10(a)(1)-(4). Under the PUAA, by contrast, a court may modify or correct an award that is "contrary to law." 42 Pa. Cons. Stat. Ann. §§ 7301(d)(2) & 7314(a).

The determination of applicable law turns on whether the arbitration provisions of the parties' reinsurance treaties evince a "clear intent" to impose the vacatur standards of the PUAA over the presumptively applicable standards of the FAA. <u>See Roadway Package Sys., Inc. v. Kayser</u>, 257 F.3d 287 (3d Cir. 2001). As we explained in <u>Roadway</u>, this "clear intent" standard is intended to protect parties' rights to contract for applicable law:

> [T]he rule we announce will preserve and facilitate the ability of parties to contract around the default federal standards. Sophisticated parties (i.e., those who employ experienced lawyers to draft their contracts) will soon learn that a generic choice-of-law clause is not enough. Assuming that both parties <u>genuinely</u> wish to be governed

2

by standards other than the FAA's, requiring something more will impose minuscule transaction costs. It is not particularly difficult, for example, to provide that "any controversy shall be settled by arbitration in accordance with the terms of the Pennsylvania Uniform Arbitration Act."

Id. at 297 (emphases in original). As a general matter, applying the "clear intent" standard so strictly as to functionally preclude parties from contracting for non-FAA standards is contrary to Roadway's attempt to fashion a rule protecting parties' right to determine the substantive law governing arbitration of their disputes and judicial enforcement vel non of any arbitral award. As the Supreme Court explained,

[a]rbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate . . . so too may they specify by contract the rules under which that arbitration will be conducted. Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA.

Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989) (citation omitted).

3

On my reading, the language of the treaties "suggested that the parties intended to be bound by standards borrowed from state law," Roadway, 257 F.3d at 297 n.5, with sufficiently "clear intent." The treaties mandate, in relevant part:

> [A]ny dispute or difference between the Reinsured and the Reinsurers relating to the interpretation or performance of this Agreement . . . or any transaction under this Agreement . . . shall be submitted to binding arbitration . . . in accordance with the rules and procedures established by the [PUAA].

(J.A. 141) (emphasis added.) The language of the arbitration provision is specific and unambiguous, and it evinces an intent by the parties to "abide by state rules of arbitration." Volt, 489 U.S. at 479. The PUAA contains rules of judicial vacatur. See 42 Pa. Cons. Stat. Ann. § 7314(a) ("General rule – (1) On application of a party, the court shall vacate an award where . . . ") (emphasis added). Consequently, when the parties contracted to have "any dispute or difference" between them governed by arbitration in accordance with the "rules and procedures" of the PUAA, they successfully demonstrated a clear intent to adopt, inter alia, the vacatur rules of the PUAA. Although I agree with the majority's characterization of the arbitration clause as concerned largely with the execution of the arbitration itself, that is insufficient to render null and void the clear mandate of the contractual language, incorporating the PUAA, which includes a specific provision detailing when a

4

court may "vacate an award." 42 Pa. Cons. Stat. Ann. § 7314(a).

I also cannot agree with the majority's conclusion that the service-of-suit clause can be read to abrogate the arbitration clause's wholesale adoption, by plain language, of the "rules and procedures" of the PUAA. (J.A. 141.) A service-of-suit clause is a mechanism to assist implementation of an arbitration award by establishing a judicial forum for the enforcement of the award.[18] Service-of-suit clauses are profoundly distinct from choice-of-law clauses, and I cannot adopt the majority's stretch of the canons of logical inference to conclude that a service-of-suit clause, without more, may dictate the choice of substantive law by omitting an affirmative declaration of what standard should govern judicial review of arbitral awards. This qualifies, I believe, as the fallacy of <u>non sequitur</u>.[19] Our Court has recently rejected just such an attempt to interpret a service-of-suit clause to mandate the form of dispute-resolution: "[s]ervice-of-suit clauses <u>do not negate accompanying arbitration clauses</u>; indeed, they may complement arbitration clauses by establishing a

---

[18]This is of particular necessity when one party to a contract resides and conducts business almost exclusively outside of the United States. This likely explains why the service-of-suit clause specifically subjects the London-based Reinsurers – and not the Reinsured – to the jurisdiction of any court of competent jurisdiction in the United States.

[19]An argument that contains a conclusion that does not necessarily follow from the premises offered in its support.

5

judicial forum in which a party may enforce arbitration." Century Indem. Co. v. Certain Underwriters at Lloyd's, London, Subscribing to Retrocessional Agreement Nos. 950548, 950549, & 950646, 584 F.3d 513, 554 (3d Cir. 2009) (emphasis added). Service-of-suit clauses are simply not intended, nor are they designed, to select governing substantive law, absent the inclusion of an affirmative choice-of-law provision. Accordingly, the failure of the clause in question to explicitly adopt the PUAA's vacatur standards does not even suggest, much less compel, a finding that the parties' contractual adoption of the "rules and procedures" of the PUAA to govern arbitration of "any dispute or difference" excepts the rules for judicial review of contested awards. (J.A. 141, 142.)

## II.

In my view, the plain language of the arbitration provision demonstrates a sufficiently clear intent to impose all the rules and procedures of the PUAA, including the vacatur rules, 42 Pa. Cons. Stat. Ann. §§ 7302(d)(2) & 7314(a). I would remand these proceedings to the District Court for reconsideration of the Motion to Vacate under the vacatur provisions of the PUAA. For the foregoing reasons, I respectfully dissent from the reasoning and conclusion of Part III(B) of the Court's opinion.