**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-1627 and 15-1628
_____

ELNOR WHITEHEAD, as Executrix of the Estate of
John Cavadus Whitehead, Sr.
v.
THE PULLMAN GROUP, LLC,

Appellant in No. 15-1627
___

BARBARA MCFADDEN, as Executrix of the Estate of
Gene McFadden
v.
THE PULLMAN GROUP, LLC,

Appellant in No. 15-1628
_____

On Appeal from the District Court
for the Eastern District of Pennsylvania
(Civ. Nos. 2-08-cv-00192 and 2-08-cv-00193)
District Judge:  Honorable Legrome D. Davis
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 10, 2015

Before:  FUENTES, CHAGARES, and GREENBERG,
*Circuit Judges*

(Opinion Filed:  January 22, 2016)

Armen Manasserian, Esq.
3121 Chadney Drive
California, CA  91206

Felton T. Newell, Esq.
The Newell Law Firm
601 South Figueroa Street, Suite 4050
Los Angeles, CA  90017

*Attorneys for Appellants*

Sayde J. Ladov, Esq.
Dolchin, Slotkin & Todd, P.C.
50 South 16th Street, Suite 3530
Philadelphia, PA  19102

*Attorneys for Appellees*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*:

Singer-songwriters John Whitehead and Gene McFadden were "an integral part of the Philadelphia music

scene in the 1970s."[1]   In 2002, appellant David Pullman approached Whitehead and McFadden about purchasing their song catalogue.[2]   The parties signed a contract but never finalized the sale.   Whitehead and McFadden passed away in 2004 and 2006, respectively, and Pullman became embroiled in a series of disputes with their estates over ownership of the song catalogue.[3]   The parties eventually agreed to arbitration. Pullman, unhappy with the arbitral panel's ruling, moved in the District Court to vacate the arbitration award on the ground that the panel had committed legal errors that made it impossible for him to present a winning case.   The District Court denied Pullman's motions, and Pullman now appeals. Even if we were to agree with Pullman that the arbitrators misapplied the law—and we do not—legal error alone is not a sufficient basis to vacate the results of an arbitration. Accordingly, we will affirm.

## I.

Whitehead, McFadden, and Pullman entered into a contract in May of 2002.[4]   The agreement gave Pullman the exclusive option to purchase Whitehead and McFadden's song catalogue following a 180-day period in which Pullman was to conduct due diligence about the catalogue's value.[5]

[1] Appellees' Br. at 2 (punctuation modified).

[2] Pullman acted through his company, The Pullman Group, LLC.   We will refer to appellants collectively as "Pullman."

[3] We will refer to appellees collectively as "the Estates."

[4] *See* Appellants' App. at 67–73 (a copy of the contract).

[5] *Id.* at 68 ¶¶ 2–3.

3

Once Pullman had completed his investigation, he had the right to terminate the transaction after giving written notice to Whitehead and McFadden.[6] In the event that any dispute arose under the contract, the parties agreed to arbitration in New York City under the rules of the American Arbitration Association.[7]

Pullman claims that his investigation turned up several tax liens that diminished the value of the song catalogue.[8] Pullman communicated his concerns to Whitehead and McFadden via telephone, at which point they allegedly told him that they would get back to him with more information.[9] Pullman contends that the two songwriters eventually told him that they did not want to consummate the transaction, thereby breaching their agreement.[10]

The Estates assert that all of this occurred unbeknownst to Whitehead and McFadden's relatives. After Whitehead and McFadden died, the Estates entered into separate negotiations to sell the song catalogue to Warner Chappell Music for $4.4 million.[11] Shortly before completion of the transaction, the Estates received a letter from Pullman disclosing the existence of the May 2002 agreement. A few

---

[6] *Id.* at 71 ¶ 9.

[7] *Id.* ¶ 11.

[8] J.A. 84 (Arbitration Tr. at 215:18–216:6), 86 (222:12–19).

[9] *Id.* at 85 (Arbitration Tr. at 220:4–24).

[10] *Id.* at 87 (Arbitration Tr. at 227:15–228:4).

[11] *Id.* at 114–15 (Arbitration Tr. at 336:21–337:9).

4

months later, Warner Chappell withdrew its offer to purchase the song catalogue.[12]

Litigation ensued. The Estates, claiming that Pullman had "torpedoed the deal with Warner Chappell in an effort to get McFadden and Whitehead to sell their catalogue to him for less money," sued Pullman in the Court of Common Pleas of Philadelphia County.[13] Pullman removed the case to the Eastern District of Pennsylvania on the basis of diversity jurisdiction. The Estates ultimately sought (i) a declaratory judgment that Pullman's contract with Whitehead and McFadden was void, and (ii) damages for intentional interference with contractual relations. Pullman counterclaimed, seeking his own declaratory judgment and raising a claim for breach of the May 2002 agreement.[14] The parties ultimately filed stipulations agreeing to send the case to arbitration.[15]

A panel of three arbitrators issued its final award in September of 2014.[16] The panel dismissed the parties'

---

[12] *Id.* at 116–17 (Arbitration Tr. at 344:17–345:6).

[13] Appellees' Br. at 5.

[14] J.A. 7 (containing the District Court's summary of the case's procedural history).

[15] Appellants' App. at 75–76 (a copy of the stipulation).

[16] *Id.* at 2–11. The arbitrators included the Hon. George C. Pratt, formerly a judge in the Eastern District of New York (1976–1982) and on the Second Circuit (1982–1995); the Hon. Richard D. Rosenbloom, formerly a justice on the New York State Supreme Court; and James Kobak, Jr., Esq.

breach-of-contract and tort claims and dismissed the Estates' request for a declaratory judgment as moot. While the panel agreed with Pullman that the May 2002 agreement with Whitehead and McFadden was a valid contract, it also concluded that Pullman had failed to introduce evidence sufficient to prove that he had ever notified Whitehead and McFadden that he had completed his due diligence. Consequently, the panel ruled that Pullman's option to purchase the song catalogue had lapsed and the May 2002 agreement was no longer enforceable.[17]

Pullman then moved to vacate the arbitral award. The District Court denied the motions, leading to this appeal.[18]

## II.

Pullman's primary argument is that the arbitral panel, which conducted its proceedings in accordance with New York law, erred in its application of that state's so-called Dead Man's Statute.[19] Subject to certain exceptions, the

---

[17] *Id.* at 4–5.

[18] The District Court exercised jurisdiction under 28 U.S.C. § 1332. This Court has jurisdiction over an appeal from the District Court's final order under 28 U.S.C. § 1291. The District Court entered its final order on February 13, 2015, and Pullman timely appealed. *See* J.A. 6–15 (District Court order); *id.* at 2–4 (Pullman's notice of appeal).

[19] N.Y. C.P.L.R. 4519. The Rule states:

Statute "disqualifies parties interested in litigation from testifying about personal transactions or communications with deceased or mentally ill persons."[20] Its purpose is "to protect the estate of the deceased from claims of the living who, through their own perjury, could make factual assertions which the decedent could not refute in court."[21] After the parties submitted briefs addressing whether the Dead Man's Statute should apply to the arbitration, the panel ruled that (i) the Statute would apply, but (ii) rather than exclude otherwise inadmissible evidence from the hearing, the arbitrators would simply not "give it any weight" by "filtering

---

"Upon the trial of an action or the hearing upon the merits of a special proceeding, a party or a person interested in the event . . . shall not be examined as a witness in his own behalf or interest . . . against the executor, administrator or survivor of a deceased person . . . concerning a personal transaction or communication between the witness and the deceased person . . . except where the executor, administrator, survivor . . . or person so deriving title or interest is examined in his own behalf . . . concerning the same transaction or communication."

[20] *Poslock v. Teachers' Ret. Bd. of Teachers' Ret. Sys.*, 666 N.E.2d 528, 530 (N.Y. 1996).

[21] *Id.* (quoting *In re Wood's Estate*, 418 N.E.2d 365, 366–67 (N.Y. 1981)).

7

out the evidence in our own minds."[22]

By causing the arbitrators to discount any testimony about oral communications between Pullman and his contractual counterparties, these rulings made it very difficult for Pullman to present a winning case. Because the panel concluded that the import of the May 2002 agreement hinged on whether Pullman had notified Whitehead and McFadden that he had completed his due diligence, Pullman asserts that the only way he could have succeeded in the arbitration was by producing evidence that he had notified Whitehead and McFadden *in writing* about the results of his investigation. Pullman claims not to have done so for the entirely understandable reason that he did not anticipate that Whitehead and McFadden would die. Pullman now argues that the arbitrators' application of the Dead Man's Statute was erroneous because it effectively made it impossible for him to prove his case, thereby depriving him of a fair hearing.

## III.

The District Court concluded that even if the arbitral panel erred in its application of the Dead Man's Statute, that error was not sufficient to vacate the results of the parties' arbitration. We agree.[23]

---

[22] J.A. 31 (Arbitration Tr. at 4:3–12).

[23] When reviewing a district court's denial of a motion to vacate an arbitration award, we review its legal conclusions de novo and its factual findings for clear error. *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012), *as amended* (Apr. 4, 2012), *aff'd*, 133 S. Ct. 2064 (2013).

We begin with the Federal Arbitration Act, which specifies four circumstances under which a district court can vacate an arbitral award.[24] The Supreme Court has held that these are the "exclusive grounds" for moving to vacate an award in a district court.[25] One of the four grounds is "misconduct . . . in refusing to hear evidence pertinent and material to the controversy."[26] Pullman asserts that the arbitral panel erred under this subsection by refusing to consider testimony about Pullman's oral communications with Whitehead and McFadden.

Contrary to Pullman's argument, we have long held that for an error to justify vacating an arbitration award, it must be "not simply an error of law, but [one] which so affects the rights of a party that it may be said that he was deprived of a fair hearing."[27] We have also spoken of procedural irregularities so prejudicial that they result in "fundamental unfairness."[28] Here, we discern no unfairness at all. The arbitral panel reasonably chose not to consider potentially self-serving testimony about communications with persons who are no longer able to present their side of the

---

[24] 9 U.S.C. § 10(a).

[25] *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008).

[26] 9 U.S.C. § 10(a)(3).

[27] *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3d Cir. 1968).

[28] *Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985, 995 (3d Cir. 1997).

story.

Nor are we persuaded by Pullman's argument that the only way he could have succeeded before the arbitrators was to have documented his communications with Whitehead and McFadden in anticipation of the fact that they might die. Pullman makes this assertion as though it illuminates some manifest injustice. To the contrary, the May 2002 agreement specified that any dispute about its meaning was to be arbitrated in New York. It was entirely foreseeable—even in 2002—that an arbitral panel comprised of New York jurists might apply that state's evidentiary rules, including the Dead Man's Statute.

Pullman also argues that, even if the arbitral panel's decision to apply the Statute was reasonable, the Estates "opened the door" to testimony about oral communications with Whitehead and McFadden by introducing evidence on the same subject. This argument is unavailing. Pullman is of course correct that a party generally cannot use an evidentiary rule as both sword and shield. Even so, that principle is meant to prevent one party from gaining an unfair advantage; it has no application to the present circumstances, in which the arbitral panel assured the parties that it would "filter out" any inadmissible testimony. The purpose of the panel's ruling was to make the parties' task easier by permitting them to present their respective cases without having to worry

about triggering any evidentiary tripwires.[29]  In view of the arbitrators' promise to "filter out" any problematic testimony, it is fair to say that the panel reached the same result as it would have if there had been no testimony whatsoever about conversations with Whitehead and McFadden.  There was no "door" for the Estates to open at all.

## IV.

Lastly, Pullman contends that the arbitrators' actions amounted to a "manifest disregard of the law."[30]  Whether this standard survived the Supreme Court's conclusion in *Mattel* that the Federal Arbitration Act provides the "exclusive grounds" for vacating an arbitral award is an open question.[31]  A circuit split has since developed, and this Court has not yet weighed-in.[32]  We decline the opportunity to do so

---

[29] *See* J.A. 85 (Arbitration Tr. at 218:14–25) (in which the chairman of the panel clarifies that the panel is "not preventing anyone from talking about" evidence otherwise inadmissible under the Dead Man's Statute because it is "almost impossible to try to filter out [such evidence] by question and answer").

[30] Appellants' Br. at 21–23.

[31] *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010) (declining to resolve the issue).

[32] *See, e.g.*, *Bellantuono v. ICAP Sec. USA, LLC*, 557 F. App'x 168, 173–74 & n.3 (3d Cir. 2014) (explaining the current state of the law); *Paul Green Sch. of Rock Music Franchising, LLC v. Smith*, 389 F. App'x 172, 176–77 (3d Cir. 2010) (same).

11

now.

Indeed, even if we were to consider Pullman's arguments under the rubric of "manifest disregard of the law," we still would not arrive where Pullman wants us to go. The manifest disregard standard requires more than legal error. Rather, the arbitrators' decision "must fly in the face of clearly established legal precedent,"[33] such as where an arbitrator "appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it."[34] We have therefore described this standard as "extremely deferential."[35] In these circumstances, where the arbitrators were fully cognizant of the Dead Man's Statute, permitted the parties to brief the issue, and then applied the Statute in a way designed to promote efficiency and fairness in the arbitral proceedings, we see no legal error at all—much less one that would rise to the level of manifest disregard of the law.

## V.

Pullman twice agreed to settle disputes arising under the May 2002 agreement through arbitration, first in the agreement itself and again by stipulating to do so in the District Court. Having made that commitment, he is now bound by the terms of his bargain. Because we see no

---

[33] *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995).

[34] *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986).

[35] *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003).

unfairness in the arbitrators' conduct, we will affirm the judgments of the District Court.