**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-2079 and 18-2144
_____

SABRE GLBL, INC,

Appellant in No. 18-2144

v.

MELODY SHAN, a/k/a SHAN MELODY XIAOYUN,

Appellant in No. 18-2079

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:15-cv-08900)
District Judge:  Honorable William J. Martini

_____

Argued January 24, 2019

Before: CHAGARES, BIBAS, *Circuit Judges*, and SÁNCHEZ,[*] *Chief District Judge*.

(Filed: July 3, 2019)

Patricia L. Peden [ARGUED]
Burke Williams & Sorensen
1901 Harrison Street
Suite 900
Oakland, CA  94612
        *Counsel for Melody Shan*

Christine A. Amalfe [ARGUED]
Gibbons
One Gateway Center

_____

[*] The Honorable Juan R. Sánchez, Chief District Judge of the United States District Court
for the Eastern District of Pennsylvania, sitting by designation.

Newark, NJ 07102
        *Counsel for Sabre GLBL, Inc.*

_____

OPINION[**]

_____

SÁNCHEZ, Chief District Judge.

Following a five-day hearing, an arbitrator found that Melody Shan had breached her fiduciary and contractual obligations to Sabre GLBL, Inc., her former employer, and awarded Sabre damages, injunctive relief, and attorney's fees for these and other violations of state and federal law. Sabre moved to confirm the arbitration award in its entirety, and Shan moved to vacate the arbitrator's award of "head start" disgorgement damages and attorney's fees. Granting both motions in part, the District Court confirmed the award of damages and injunctive relief, but vacated the award of attorney's fees. Both parties now appeal from the District Court's judgment. Because we find no basis to disturb either of the challenged components of the arbitrator's award, we will affirm the judgment insofar as it confirmed the award of head start damages and reverse it insofar as it vacated the award of attorney's fees.

## I.    BACKGROUND

For nearly two decades, Shan worked for Sabre, a Texas-based technology solutions provider to the global travel and tourism industry, in various capacities in the United States and China. In 2013, after a seven-year stint in China, Shan returned to the

_____

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

United States as a consultant in Sabre's headquarters in Dallas, Texas. She later relocated to New Jersey and continued working for Sabre remotely.

In connection with her new consulting position, Shan entered into an Employee Intellectual Property and Confidentiality Agreement (EIPC Agreement) with Sabre in September 2013. The EIPC Agreement prohibited Shan from disclosing Sabre's confidential information or using the information for her own benefit or for the benefit of a third party. It also restricted Shan's ability to compete with Sabre and interfere with Sabre's relationships with its employees, contractors, and customers both during and for a period of time after her employment with the company. The Agreement also included a choice of law and arbitration provision, specifying that its "construction, interpretation and enforcement" would be governed by Texas law and that "any and all claims, disputes, or controversies arising out of or related to this Agreement, or the breach of this Agreement, shall be resolved by binding arbitration." App. 136.

Notwithstanding the prohibitions in the EIPC Agreement, Shan started a competing Chinese company—Pi-Solution Hangzhou—while still employed by Sabre, and began recruiting Sabre employees and soliciting Sabre customers for her new company. Shan ultimately acquired a 68 percent ownership interest in Pi-Solution Hangzhou through Resource Optimization Intelligent Solution Limited (ROIS), a Hong Kong holding company she formed for the purpose of acquiring shares in Pi-Solution Hangzhou. Shan was at all times the sole shareholder in ROIS.

In September 2014, Shan resigned from Sabre and returned to China, where she continued to work on her competing venture. Fourteen months later, in November 2015,

3

Sabre sued Shan in New Jersey state court. Sabre alleged that Shan had breached the EIPC Agreement and her fiduciary duty to Sabre by misusing Sabre's confidential and trade secret information, stealing Sabre's employees, soliciting Sabre's customers, and competing with Sabre through Pi-Solution Hangzhou. Sabre alleged that these actions also violated other state and federal law.

Shan removed the action to federal court and moved to compel arbitration pursuant to the EIPC Agreement's arbitration clause. The District Court granted the motion, and in April 2016 Sabre initiated an arbitration proceeding before the Judicial Arbitration and Mediation Services (JAMS) in Dallas, Texas.

A five-day arbitration hearing was held in September 2017, and the parties thereafter submitted closing briefs. On January 6, 2018, the arbitrator issued an Interim Award. Applying Texas law, the arbitrator found that Shan had breached her fiduciary duty to Sabre and awarded Sabre two categories of damages for the breach. First, the arbitrator found Sabre was entitled to disgorgement of $200,000 of the salary Shan received from Sabre during the period of her disloyalty. And second, the arbitrator awarded Sabre $1,173,318 in "head start" damages, representing the benefit Shan received from her misconduct based on her equity interest in Pi-Solution Hangzhou, which obtained an unlawful development and operations head start as a result of Shan's misconduct.[1]

---

[1] Sabre also sought to recover a third category of damages for Shan's breach of fiduciary duty—saved development cost damages, representing Shan's share of the development costs Pi-Solution Hangzhou avoided as a result of her misconduct. The arbitrator

4

As to Sabre's remaining claims, the arbitrator also found Shan liable for breach of contract; tortious interference with Sabre's employment contracts, customer contracts, and prospective economic advantage; and violations of the New Jersey Trade Secrets Act (NJTSA), N.J. Stat. Ann. § 56:15-1 to -9, and the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Although the arbitrator declined to award any additional damages on these claims, he granted Sabre injunctive relief on its breach of contract claim and awarded Sabre attorney's fees, in an amount to be determined, under the NJTSA.

Following issuance of the Interim Award, Sabre moved to confirm the Award, and Shan moved to vacate it. On February 12, 2018, after further briefing on the fee issue, the arbitrator issued a Final Award, which fixed the award of attorney's fees at $450,000, but was otherwise identical to the Interim Award. Sabre thereafter moved to confirm the Final Award. On April 23, 2018, the District Court issued an opinion and order granting Sabre's motion to confirm the Final Award as to damages and injunctive relief, but granting Shan's motion to vacate the award of attorney's fees. Judgment was entered in the case the following day. Both parties now appeal.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1332, 1367(a), and 1441. This Court has jurisdiction under 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(1)(D)-(E). "On appeal from a district court's ruling on a motion to confirm or vacate an

---

declined to award this category of damages, however, finding Sabre's evidence of Pi-Solution Hangzhou's saved development costs to be speculative.

5

arbitration award, we review its legal conclusions de novo and its factual findings for clear error." *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012), *aff'd*, 569 U.S. 564 (2013).

Review of the underlying arbitration award, in contrast, is "extremely deferential." *Dluhos v. Strasberg*, 321 F.3d 365, 372 (3d Cir. 2003). Under the Federal Arbitration Act (FAA), a court may vacate an arbitration award only on the following grounds:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). This Court has held that an arbitration award may also be vacated where the award "evidence[s] a manifest disregard for the law rather than an erroneous interpretation of the law." *Dluhos*, 321 F.3d at 370 (alteration in original) (quoting *Local 863 Int'l Bhd. of Teamsters v. Jersey Coast Egg Producers, Inc.*, 773 F.3d 530, 534 (3d Cir. 1985)).

It is an open question in this Circuit whether an arbitrator's manifest disregard of the law remains a valid basis for vacatur in light of the Supreme Court's holding in *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, that § 10 of the FAA provides the statute's "exclusive grounds for expedited vacatur" of an arbitration award. 552 U.S. 576, 584

6

(2008). The Supreme Court has declined to decide whether the manifest disregard standard survives *Hall Street Assocs.* either "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010). And while other Courts of Appeals are divided on the issue, this Court has found it unnecessary to weigh in to date. *See, e.g.*, *Whitehead v. Pullman Grp., LLC*, 811 F.3d 116, 120-21 (3d Cir. 2016) (noting the existence of a circuit split on the continued vitality of the manifest disregard standard but declining to address the issue where the arbitrator's alleged error did not "rise to the level of manifest disregard of the law"). We again find it unnecessary to resolve this issue. The parties have not briefed it. And even assuming the manifest-disregard standard retains its vitality, Shan has not shown that relief is warranted under that standard.

## III. DISCUSSION

### A. Shan's Appeal

Shan appeals from the District Court's judgment insofar as it denied her motion to vacate the award of head start damages. Shan argues vacatur is warranted because the arbitrator manifestly disregarded numerous aspects of Texas law in awarding such damages. She also invokes three statutory grounds for vacatur, arguing the arbitrator exceeded his powers by failing to address her mitigation of damages affirmative defense in his written opinion, deprived her of a fair hearing on damages by allowing Sabre to submit an untimely expert report, and exhibited evident partiality by refusing to follow

the controlling law on damages. We begin by discussing the basis for the head start

damages award and then address each of these asserted grounds for vacatur in turn.

### 1. Head Start Damages

In awarding head start damages, the arbitrator accepted the methodology and

calculations provided by Sabre's damages expert, Robert L. Vigil, Ph.D., who submitted

a written report and testified at the arbitration hearing. The premise of this damages

theory is that Shan's breach of her fiduciary duty to Sabre—including her acquisition and

use of Sabre's confidential information and trade secrets and recruitment of key Sabre

employees—gave Pi-Solution Hangzhou a two-year head start, which the company

would not have had but for Shan's misconduct. Head start damages represent Dr. Vigil's

effort to quantify the value Shan obtained from this two-year head start based on her

ownership interest, through ROIS, in Pi-Solution Hangzhou.

To calculate head start damages, Dr. Vigil first determined the incremental value

of the head start to Pi-Solution Hangzhou by estimating the value of the company as of

December 31, 2014, with and without the head start and taking the difference between the

two.[2] He then multiplied this figure by 68 percent, Shan's ownership interest in Pi-

Solution Hangzhou, through ROIS, to determine the amount Shan personally benefitted

from her misappropriation and disloyalty. In this manner, Dr. Vigil determined that the

---

[2] In valuing the company with the head start, Dr. Vigil relied on a transaction in which an outside investor committed to purchase 20 percent of Pi-Solution Hangzhou in exchange for ¥10 million. He then discounted the resulting valuation to determine the value of the company without the head start to reflect that, but for Shan's fiduciary breach, the company would not have achieved that valuation for an additional two years.

incremental value Pi-Solution Hangzhou received from the two-year head start was $1,725,467, and Shan's share of this incremental value was $1,173,318. Citing Dr. Vigil's expert report, the arbitrator awarded Sabre $1,173,318 in head start damages, noting that Dr. Vigil had used "an accepted and credible approach" in calculating the benefit to Shan from her misconduct. App. 877.

2. "Manifest Disregard"

Shan principally challenges the award of head start damages on the ground that the arbitrator manifestly disregarded various aspects of Texas law in granting such relief.[3] To obtain vacatur under this standard, Shan must show more than that the arbitrator erred in interpreting or applying the governing law. *Whitehead*, 811 F.3d at 121. She must show the arbitrator's decision "'fl[ies] in the face of clearly established legal precedent,' such as where an arbitrator 'appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.'" *Id.* (first quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995); then quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986)). None of the alleged legal errors identified by Shan warrants relief under this standard.

Shan first argues the arbitrator manifestly disregarded the legal principles governing the award of damages for breach of fiduciary duty and trade secret

---

[3] To the extent that Shan also argues the arbitrator exceeded his powers under the EIPC Agreement by manifestly disregarding Texas law, we do not separately address this argument.

9

misappropriation set forth in *Carbo Ceramics, Inc. v. Keefe*, 166 F. App'x 714 (5th Cir. 2006), the case he cited to support his damages award.  We disagree for two reasons.

First, *Carbo Ceramics* is not "clearly established legal precedent."  *Whitehead*, 811 F.3d at 121 (quoting *Jaros*, 70 F.3d at 421).  Texas law governs Shan's breach of fiduciary duty claim.  And while *Carbo Ceramics* purports to apply Texas law, it cites no Texas law to prove the principle for which Shan cites it.  Instead, *Carbo Ceramics* cites two federal cases: *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704 (9th Cir. 2003), and *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974).  *Carbo Ceramics*, 166 F. App'x at 723.  *Bourns* is a Ninth Circuit case applying California law. And *Univ. Computing Co.* is a Fifth Circuit case applying Georgia law.

So we have a non-precedential Fifth Circuit case citing applications of California and Georgia law.  This is not a clearly established legal precedent of Texas law.  It is not Texas law at all.  Thus, the arbitrator would not have manifestly disregarded clearly established principles of Texas law even if he had misapplied *Carbo Ceramics*.

Second, the arbitrator did not misapply *Carbo Ceramics*.  *Carbo Ceramics* did not involve a request for head start damages; the plaintiff in the case sought to establish damages for trade secret misappropriation based on a "profit-split method," which entailed allocating a portion of the defendant's overall profits to the plaintiff's misappropriated trade secrets.  *Id.* at 723-24.  Addressing this damages theory, the court noted it "d[id] not fit within" the established methods of calculating damages for trade secret misappropriation outlined elsewhere in the opinion.  *Id.* at 724.  Yet the court did not reject the theory for this reason, instead holding the plaintiff could not recover

10

because the revenue projections underlying the theory were too speculative to support relief. *Id.*[4]

Shan argues Sabre's head start damages calculation was likewise flawed as a matter of proof, but this argument is based on the faulty premise that head start damages and saved development costs are "the same thing." Shan Br. 21. Proceeding from this premise, Shan argues that by accepting Sabre's head start damages theory, the arbitrator effectively allowed Sabre to recover saved development costs absent any evidence of such costs, which the arbitrator expressly found was lacking. As Dr. Vigil's report and hearing testimony make clear, however, head start damages and saved development costs are separate damages theories that seek disgorgement of two different benefits Shan received as a result of her misconduct. Head start damages represent the benefit to Shan from the increase in Pi-Solution Hangzhou's value, as of December 31, 2014, as a result of the company's being two years further along than it otherwise would have been in developing and commercializing its products and services.[5] Saved development costs, in

---

[4] Insofar as Shan argues head start damages are impermissible because they are not among the damages theories discussed by the court in *Carbo Ceramics*, the case does not support this interpretation. The court did not hold the enumerated theories were the exclusive methods of calculating trade secret misappropriation damages; on the contrary, it expressly recognized that "plaintiffs are entitled to adapt their damage theory to fit within the particular facts of the case." 166 F. App'x at 724.

[5] Contrary to Shan's assertion, head start damages are not based on any actual development and operations costs Pi-Solution Hangzhou saved during a two-year head start period, but on the impact of the two-year development and operations head start on the value of the company. Thus, insofar as Shan argues the arbitration award should be vacated because it was based on the "improper material assumption[]" that Shan "received save[d] development and operational expenses," Shan Br. 33, this argument is also unfounded.

11

contrast, represent the benefit to Shan from Pi-Solution Hangzhou's ability to avoid incurring certain research and development costs by using the confidential information and trade secrets Shan misappropriated rather than developing that information on its own. The arbitrator's finding that Sabre failed to prove Pi-Solution Hangzhou's saved development costs thus has no impact on the award of head start damages.

Shan also argues *Carbo Ceramics* precludes the head start damages awarded in this case because the foundation of Sabre's damages calculation—Dr. Vigil's valuation of Pi-Solution Hangzhou—is no less speculative than the revenue projections on which the damages calculation in *Carbo Ceramics* was based. This argument is unpersuasive. The expert in *Carbo Ceramics* relied on the defendant's business plan to project ten years of future revenue for a plant that had neither been built nor produced a product. *See* 166 F. App'x at 723-24. Here, in contrast, Dr. Vigil based his valuation of Pi-Solution Hangzhou on what an actual outside investor was willing to pay for a 20 percent interest in the company. *Carbo Ceramics* does not preclude this method of valuation,[6] and the arbitrator therefore did not act in manifest disregard of that case by accepting Dr. Vigil's

---

[6] Nor is Dr. Vigil's valuation method precluded by *M & A Tech., Inc. v. iValue Grp., Inc.*, 295 S.W.3d 356 (Tex. App. 2009), another case Shan argues the arbitrator manifestly disregarded. In *M & A Tech.*, the court reversed a $3 million jury award to a startup whose value had been "totally destroyed" when its servers were erased, finding the award could not be justified based on the company's $2.4 million in shareholder equity because the $3 million damage award was "well outside . . . the range for the shareholder equity." *Id.* at 365, 368. The court did not hold that shareholder equity is categorically an impermissible method of establishing the value of a company.

12

calculation.  In sum, nothing in *Carbo Ceramics* forecloses the head start damages awarded in this case.

Shan also argues the arbitrator manifestly disregarded Texas law regarding causation and apportionment in accepting Sabre's damages calculation because Sabre did not prove the amount of damages attributable to each trade secret or piece of confidential information she allegedly misappropriated.  In lieu of assessing damages item by item, Dr. Vigil determined that Shan's misappropriation of Sabre's confidential information and trade secrets and other breaches of her fiduciary duty to Sabre in the aggregate gave Pi-Solution Hangzhou a two-year head start.  Shan cites no clearly established Texas law precluding this approach.

Shan argues apportionment was required under *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018), a case decided after the Final Award in this case was issued.  In that case, the Federal Circuit, applying Texas law, vacated an award of disgorgement of profits for trade secret misappropriation where the plaintiff's expert failed to "explain which of the trade secrets contributed to what amount of profit to be disgorged."  *Id.* at 1317.  The court vacated the award only after concluding that the defendant could not be liable for misappropriating two of the three trade secrets at issue and that there was "no basis to conclude that the remaining ground for liability . . . support[ed] the entire award."  *Id.*  The case thus does not establish that apportionment of damages is required in all cases involving trade secrets.[7]

---

[7] The two cases Shan cited to the arbitrator for the proposition that Sabre was required to apportion its claimed damages among the misappropriated trade secrets—*Pike v. Tex.*

13

Shan argues vacatur is required here because much of the allegedly misappropriated information that contributed to Pi-Solution Hangzhou's head start—including Sabre's source code—was neither confidential nor trade secrets, and damages attributable to such information must therefore be excluded from any award. Although Shan frames this argument in terms of the arbitrator's manifest disregard of the law regarding causation and apportionment, she in effect seeks to relitigate the status of the misappropriated information. The status of this information was contested in the arbitration, and the arbitrator agreed with Sabre that Shan had misappropriated Sabre's confidential information and trade secrets, including its source code. Shan has not established a reason to disturb the arbitrator's findings in this regard. *See Tanoma Mining Co. v. Local Union No. 1269, United Mine Workers of Am.*, 896 F.2d 745, 748 (3d Cir. 1990) (holding an arbitrator's factual findings need only have "some support in the record").[8]

---

*EMC Mgmt., LLC*, No. 10-14-00274-CV, 2017 WL 2507783 (Tex. App. June 7, 2017), and *Alcatel USA, Inc. v. Cisco Sys., Inc.*, 239 F. Supp. 2d 660 (E.D. Tex. 2002)—are also inapposite. *Pike* did not address apportionment. And in *Alcatel*, the court mentioned apportionment in the course of rejecting a plaintiff's attempt to equate the value of its allegedly misappropriated trade secrets with the entire purchase price of the misappropriating company, noting the plaintiff's failure to apportion the purchase price among its intellectual property and other components of the sale. *See* 239 F. Supp. 2d at 670-71. Neither case has any application here.

[8] Shan also argues Dr. Vigil's head start damages calculation was flawed because he improperly included all products in development at Pi-Solution Hangzhou in his valuation of the company, even though the company had products in development unrelated to the misappropriated information. In calculating head start damages, Dr. Vigil assumed that all or most of Pi-Solution Hangzhou's value, as of December 31, 2014, was attributable to products that were (or would be) developed sooner than they otherwise would have been as a result of Shan's misappropriation and disloyalty.

14

Shan next argues the arbitrator manifestly disregarded Texas law prohibiting disgorgement damages where the parties' relationship is governed by an express contract. This argument also lacks merit. Under Texas law, the existence of a valid, express contract covering the subject matter of the parties' dispute generally precludes recovery under a quasi-contract theory, such as unjust enrichment. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). But Shan cites no authority extending this principle to claims for breach of fiduciary duty, which sound in tort. And, in fact, the Texas Supreme Court has recognized that equitable remedies are available for breach of fiduciary duty claims, even when contractual remedies are also available. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 872-78 (Tex. 2010). While Shan argues the only available equitable remedy in a case governed by contract is disgorgement of salary, the case she cites for this proposition merely recognizes that "a person who renders service to another in a relationship of trust may be denied compensation for his service if he breaches that trust." *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 904-05 (Tex. App. 2014). It does not clearly foreclose other forms of equitable relief. *See ERI Consulting Eng'rs*, 318 S.W.3d at 873 (recognizing the courts' power to fashion equitable remedies that require a fiduciary to "account to his principal for all he has received" from his betrayal of trust, including

Although Shan notes that other products not traceable to her misconduct were in development as of the December 31, 2014, valuation date, she offers no basis on which to conclude that Dr. Vigil's assumption that the company's value was driven largely by products that were traceable to her misconduct was incorrect—much less that the arbitrator manifestly disregarded Texas law in accepting it.

15

"profit disgorgement and fee forfeiture" (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942))).

Shan's related argument that the award of head start damages was improper because Sabre's damages calculation was based on a valuation date after she left Sabre is also unpersuasive. Although Dr. Vigil used a December 31, 2014, valuation date in calculating head start damages, such damages were based on Shan's misappropriation of trade secrets and solicitation of Sabre's employees and customers, conduct that largely occurred while Shan was still employed at Sabre. Moreover, while Shan maintains her post-resignation conduct was governed solely by the EIPC Agreement, her fiduciary obligations to Sabre did not completely end when she resigned, as she continued to have a duty "not to use or to disclose to third persons . . . trade secrets . . . or other similar confidential matters . . . ." *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 581 (5th Cir. 2015) (ellipses in original) (quoting *NCH Corp. v. Broyles*, 749 F.2d 247, 254 (5th Cir. 1985)).

Finally, Shan argues the arbitrator intentionally disregarded Texas law regarding corporate separateness, first by ordering disgorgement from Shan of a benefit reaped by Pi-Solution Hangzhou absent a finding that Shan and Pi-Solution Hangzhou are alter egos, and second by calculating Shan's interest in Pi-Solution Hangzhou using shares owned by ROIS absent a finding that Shan and ROIS are alter egos.

It is a "bedrock principle of corporate law . . . that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's . . . obligations." *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006). But this principle

16

is not implicated here. The arbitration award did not impose liability on Shan for Pi-Solution Hangzhou's obligations, but for her own misconduct in recruiting Sabre employees, soliciting Sabre customers, and misappropriating Sabre's confidential information and trade secrets, all while still employed by Sabre. There was no need to pierce Pi-Solution Hangzhou's corporate veil to hold Shan liable for her own misconduct. *Cf. Hyman Farm Serv., Inc. v. Earth Oil & Gas Co.*, 920 S.W.2d 452, 455 (Tex. App. 1996) ("Under longstanding Texas law, corporate agents can be held individually liable for fraudulent or tortious acts committed while working for a corporation.").

Shan concedes as much, but argues the arbitrator could not order her to disgorge a benefit that Pi-Solution Hangzhou received as a result of her misconduct without a finding of alter ego. In awarding head start damages, however, the arbitrator credited the theory that Shan's misconduct not only benefitted Pi-Solution Hangzhou by giving the company a two-year development and operations head start but also benefitted Shan personally by increasing the value of her ownership interest in Pi-Solution Hangzhou through ROIS. There was no need to pierce Pi-Solution Hangzhou's corporate veil to require Shan to disgorge the value she personally received as a result of her misconduct. Shan cites no clearly established law holding to the contrary.

Whether the arbitrator erred in calculating the benefit Shan received from Pi-Solution Hangzhou's ill-gotten head start based on shares of Pi-Solution Hangzhou owned by ROIS without making an explicit finding that Shan and ROIS are alter egos is a closer question. We need not resolve this issue, however, as Shan waived it by failing to raise it before the arbitrator. While Shan raised the issue of corporate separateness in her

17

closing brief, her objection there was that Sabre was improperly equating Shan with Pi-Solution Hangzhou, not ROIS.  Shan did not mention ROIS in her closing brief to the arbitrator or in her opening brief in the District Court.  Rather, Shan first objected that ROIS's shares in Pi-Solution Hangzhou could not be imputed to her absent an alter ego finding in her reply memorandum in support of her motion to vacate in the District Court.  Because Shan did not raise this issue before the arbitrator, the issue is waived.  *See Teamsters Local Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40, 42-43 (3d Cir. 1985) (recognizing a party may waive objections to an arbitrator's decision by failing to address the objections before the arbitrator).

Despite her many assertions of legal error, Shan has not identified any clearly governing principle of Texas law that the arbitrator was aware of but chose to ignore in awarding head start damages.  There is thus no basis on which to conclude such damages were awarded in manifest disregard of the law.

3.      Section 10(a)(4)

Shan also argues the award of head start damages should be vacated under § 10(a)(4) of the FAA because the arbitrator exceeded his powers by failing to address her mitigation of damages affirmative defense in his written decision.  Shan raised this defense in her closing brief, arguing she was entitled to mitigation of damages because Sabre delayed in filing a lawsuit against her and then exploited this delay by using a recent equity investment in Pi-Solution Hangzhou to calculate head start damages.  But the arbitrator did not specifically address it in either the Interim or the Final Award.  Shan argues this lapse deprived her of the "mutual, final, and definite award" required under

18

the statute and the "reasoned award" to which the parties agreed.  Shan Br. 37-38.  We disagree.

"[A] reasoned award is something more than a line or two of unexplained conclusions, but something less than full findings of fact and conclusions of law on each issue raised before the panel." *Leeward Constr. Co. v. Am. Univ. of Antigua-Coll. of Med.*, 826 F.3d 634, 640 (2d Cir. 2016).  The award must "set[] forth the basic reasoning of the arbitral panel on the central issue or issues raised before it"; it "need not delve into every argument made by the parties." *Id.*

The award in this case was more than sufficient to satisfy this standard.  In his 16-page Final Award, the arbitrator set forth the reasons for his findings as to liability and damages on each of Sabre's claims for relief and specified that the award "resolves all claims between the Parties submitted for decision in this arbitration proceeding" and that "[a]ll relief requested but not granted is denied." App. 882.  Shan argues the arbitrator was required to address her mitigation of damages argument because it was her "only affirmative defense." Shan Br. 38.  But there is no basis on which to conclude this defense was a central issue in the case.  On the contrary, Shan raised the defense in the final paragraph of her 25-page closing brief, offered no evidentiary support for her assertion that "Sabre waited for damages to escalate before resolving its claims against Ms. Shan," and cited no legal authority in support of her mitigation theory. App. 861.  The arbitrator's failure to specifically address the mitigation defense is thus not surprising and does not run afoul of the requirement of a reasoned award or render the award anything less than definite and final. *Cf. Stage Stores, Inc. v. Gunnerson*, 477 S.W.3d

19

848, 861, 863 (Tex. App. 2015) (holding a "key defense" that was raised during opening and closing statements and on which both parties elicited testimony "merit[ed] some reasoning in the [arbitration] award").

4.      Section 10(a)(3)

Shan also argues the award of head start damages should be vacated under § 10(a)(3) of the FAA because the arbitrator deprived her of a fair hearing on damages by denying her motion to strike Dr. Vigil's expert report, which Sabre submitted less than three weeks before the hearing and more than two months after the deadline for expert designations had passed.  Shan argues this ruling permitted Sabre to "sandbag" her with previously undisclosed damages theories on the eve of the hearing and prevented her from adequately preparing her defense.  Shan Br. 34.

Section 10(a)(3) permits a court to vacate an arbitration award where, inter alia, the arbitrator was guilty of "misbehavior by which the rights of any party have been prejudiced."  9 U.S.C. § 10(a)(3).   "Arbitrators have wide latitude in how they conduct proceedings"; hence, a court's role in reviewing an arbitrator's procedural decisions is extremely limited.  *Office & Prof'l Emps. Int'l Union, Local No. 471 v. Brownsville Gen. Hosp.*, 186 F.3d 326, 334-35 (3d Cir. 1999).  A court may vacate an arbitration award based on an arbitrator's error in "the receipt or rejection of evidence" only if the error "so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3d Cir. 1968); *accord Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985, 995-96 (3d

20

Cir. 1997) (holding § 10(a)(3) permits vacatur of an arbitration award based on a "fundamental procedural error").

The procedural ruling in this case falls well short of this standard. The record reflects that Shan bears at least some responsibility for Sabre's late production of its expert report, as Shan herself failed to comply with the discovery deadline and admittedly did not produce many of the documents cited in the report until after the deadline for expert discovery had passed. Moreover, while Shan claimed the late disclosure prejudiced her by impairing her ability to prepare a meaningful rebuttal report, she strenuously opposed a continuance to afford her additional time to depose Dr. Vigil and retain a rebuttal expert. To accommodate Shan's concerns, the arbitrator ruled that she would be permitted to present expert rebuttal testimony at the hearing without producing a written expert report. And Shan did, in fact, present a rebuttal expert on damages at the hearing. In these circumstances, we cannot say Shan was deprived of a fair hearing on damages.

### 5. Section 10(a)(2)

Finally, Shan argues the award of head start damages should be vacated under § 10(a)(2) of the FAA because the arbitrator's refusal to follow the controlling law in awarding such damages can only be explained on the basis of partiality toward Sabre. This argument is meritless. Section 10(a)(2) allows a court to vacate an arbitration award "where there was evident partiality . . . in the arbitrators." This standard is met "only if a reasonable person would have to conclude that [the arbitrator] was partial to one side."

21

*Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 253 (3d Cir. 2013). There is no evidence of such bias here.

Because Shan has not shown the District Court erred in denying her motion to vacate the award of head start damages, this ruling will be affirmed.

### B.     Sabre's Cross-Appeal

Sabre cross-appeals from the District Court's judgment insofar as it granted Shan's motion to vacate the award of attorney's fees. The arbitrator awarded Sabre $450,000 in attorney's fees under the NJTSA, which permits an award of fees to a prevailing party if "willful and malicious misappropriation exists." N.J. Stat. Ann. § 56:15-6. The District Court vacated the fee award under § 10(a)(4) of the FAA, finding the arbitrator exceeded his powers in allowing fees because the arbitration agreement "expressly foreclosed" this remedy. App. 1093. Sabre challenges this ruling, arguing the arbitration agreement is, at a minimum, ambiguous as to the availability of attorney's fees and the fee award is therefore consistent with a rational interpretation of the agreement.

An arbitrator's authority derives from the parties' agreement to arbitrate. *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 194 (3d Cir. 2010) (en banc). "By contractually restricting the issues they will arbitrate, the individuals with whom they will arbitrate, and the arbitration procedures that will govern, parties to an arbitration agreement may place limits upon the arbitrator's powers that are enforceable by the courts." *Sutter*, 675 F.3d at 219. In agreeing to arbitrate, however, the parties "bargain[] for the arbitrator's construction of their agreement," not a court's. *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (quoting *E. Associated Coal Corp. v. Mine Workers*, 531 U.S. 57,

22

62 (2000)).  Thus, so long as an arbitral decision reflects that the arbitrator "even arguably constru[ed] or appl[ied] the contract," the decision will withstand scrutiny under § 10(a)(4), even if a court is persuaded the arbitrator committed serious errors in doing so.  *Id.* (quoting *E. Associated Coal Corp.*, 531 U.S. at 62).  Only when an arbitrator "strays from interpretation and application of the agreement"—when he "decides an issue not submitted to him, grants relief in a form that cannot be rationally derived from the parties' agreement and submissions, or issues an award that is so completely irrational that it lacks support altogether"—does he exceed his authority and subject the award to vacatur under § 10(a)(4).  *Sutter*, 675 F.3d at 219-20 (first quoting *Stolt-Nielsen*, 559 U.S. at 671; then citing *Ario v. Underwriting Members of Syndicate 53 at Lloyds for the 1998 Year of Account*, 618 F.3d 277, 295-96 (3d Cir. 2010)).

In the arbitration provision of the EIPC Agreement, the parties agreed to arbitrate clams "arising out of or related to this Agreement, or the breach of this Agreement," and to submit such claims to JAMS "in Dallas, Texas, for prompt resolution pursuant to its Employment Arbitration Rules & Procedures and subject to JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness."  App. 136.  The arbitration clause goes on to provide that "[a]ll rights, remedies and defenses applicable to claims asserted in a court of law will apply in the arbitration," and that "[t]he Parties shall bear their own attorneys' fees, and shall bear equally the expenses of the arbitral proceedings, including without limitation the fees of the arbitrator."  *Id.*  The JAMS Minimum Standards referenced in the parties' arbitration agreement also address attorney's fees.  Minimum Standard No. 1, titled "All Remedies Available," provides,

23

"All remedies that would be available under the applicable law in a court proceeding, *including attorneys fees* and exemplary damages, as well as statutes of limitations, must remain available in the arbitration. Post-arbitration remedies, if any, must remain available to an employee." App. 1037 (emphasis added).

The parties dispute whether their arbitration agreement can be interpreted to permit an award of attorney's fees where, as here, the applicable law provides fee-shifting as a remedy. Shan argues the language in the agreement specifying that the parties "shall bear their own attorneys' fees" is dispositive and expressly precludes any award of attorney's fees. In Shan's view, the Minimum Standards cannot trump the plain language of the arbitration agreement because the Minimum Standards are not part of that agreement as a matter of Texas contract law. Sabre argues that by providing that claims submitted to arbitration will be resolved "subject to" the JAMS Minimum Standards, the arbitration agreement incorporates the Standards by reference and thus requires that attorney's fees remain an available remedy in arbitration, if fees would be available under the applicable law in a court proceeding. Sabre contends the Minimum Standards take precedence over the language elsewhere in the arbitration agreement that the parties "shall bear their own attorneys' fees."[9] But even if they do not, Sabre maintains the

---

[9] Sabre's argument in this regard is based in part on a letter that JAMS sent to the parties at the outset of the arbitration proceedings, enclosing a copy of the Minimum Standards and advising the parties that the Minimum Standards would be applicable "notwithstanding any contrary provisions set forth in the parties' pre-dispute arbitration agreement." App. 1036. The letter also stated the parties "agreement to proceed" with the arbitration would "constitute[] [their] agreement to the foregoing." *Id.* Sabre argues that by proceeding with the arbitration after receiving the JAMS letter, Shan consented to the applicability of the Minimum Standards. Shan disputes this, citing the EIPC

24

arbitration agreement is at least ambiguous as to the availability of attorney's fees when authorized by a fee-shifting statute.

The parties first raised their competing interpretations in the arbitration after the arbitrator issued his Interim Award, as part of their additional briefing on the attorney's fees issue.[10] Although the arbitrator did not address the parties' arguments in the Final Award, he implicitly rejected Shan's contention that the arbitration agreement precludes attorney's fees, awarding Sabre $450,000 in fees for Shan's violation of the NJTSA.[11] We are not persuaded the arbitrator "stray[ed] from interpretation and application of the agreement" in making the fee award. *Sutter*, 675 F.3d at 220 (quoting *Stolt-Nielsen*, 559 U.S. at 671).

To prevail on this issue, Shan was required to show that the authority to award attorney's fees could not "be rationally derived from the parties' agreement and

_____

Agreement's "Entire Agreement" integration clause, which prohibits implied amendments. *See* App. 136. Because we conclude the award of attorney's fees must stand regardless of any impact the JAMS letter may have had on the parties' arbitration agreement, we need not resolve this dispute.

[10] While the parties' post-Interim Award briefing regarding attorney's fees is not part of the record, it is undisputed that the parties advanced their competing interpretations of the arbitration agreement with respect to the availability of fees as part of that briefing. *See* Sabre Br. 33 n.17; Shan Reply Br. 25-26 n.10; Sabre Reply Br. 7 n.9.

[11] Shan argues the arbitrator cannot have awarded attorney's fees based on the JAMS Minimum Standards because Sabre sought attorney's fees based only on the NJTSA and Shan's discovery violations, not the Minimum Standards. Contrary to Shan's assertion, however, there was no reason for Sabre to provide notice that it was asserting a claim for fees under the Minimum Standards because the substantive basis for the claim was the NJTSA, which provides for fee-shifting. The Minimum Standards, in contrast, provided the arbitrator with authority to grant the NJTSA's fee-shifting remedy.

submissions." *Id.* at 219-20. As long as there is an "arguable interpretation and/or application" of the agreement that would permit an award of attorney's fees, the award must stand. *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005) (quoting *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993)); *accord Ario*, 618 F.3d at 296 (holding an arbitration award is irrational when it cannot be supported "on any theory of relief").

The District Court found the arbitration agreement unambiguously precluded the arbitrator from awarding attorney's fees. But this Court previously found an arbitration agreement with similarly conflicting language to be ambiguous in *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221 (3d Cir. 2012). There, as here, the arbitration agreement provided the parties would be "responsible for the fees and costs of [their] own respective legal counsel." *Id.* at 226. However, the agreement also provided that the arbitrator had "the authority to award any remedy that would have been available to [the employee]" had the dispute been litigated in court under the applicable law and that "no remedies that otherwise would be available to [the parties] in a court of law w[ould] be forfeited by virtue of the agreement to use and be bound by the [arbitration agreement]." *Id.* at 226-27. Addressing the arbitration agreement on appeal from the denial of a motion to compel arbitration, this Court held the arbitration clause was "ambiguous regarding the award of attorneys' fees" and this ambiguity had to be interpreted by the arbitrator. *Id.* at 231.

We reach the same conclusion here. As was the case in *Quilloin*, in advocating for their respective interpretations, the parties rely on conflicting principles of contract

interpretation, which "point in different directions." *Quilloin v. Tenet HealthSystem Phila., Inc.*, 763 F. Supp. 2d 707, 726 (E.D. Pa. 2011), *rev'd on other grounds*, 673 F.3d 221 (3d Cir. 2012).  Applying the principle that contract terms should be construed "as a whole in an effort to harmonize and give effect to all provisions of the contract," the arbitration agreement can at least arguably be interpreted to require the parties to pay their own attorney's fees during the arbitration, while still allowing the arbitrator to award fees as a remedy if the applicable law permits.  *Rouse v. Tex. Capital Bank, N.A.*, 394 S.W.3d 1, 5 (Tex. App. 2011).  While Shan offers a number of arguments as to why this interpretation is incorrect under a proper application of other Texas contract interpretation principles, including the rule that ambiguities in a contract should be construed against the drafter, our task is not "to review the merits of every construction of the contract," *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598-99 (1960), but to determine whether the award can be supported "on any theory of relief," *Ario*, 618 F.3d at 296.  Because the fee award in this case passes this test, the award must stand.  Accordingly, we will reverse the District Court's judgment insofar as it vacated the award of attorney's fees.

## IV.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment insofar as it confirmed the award of head start damages, reverse the judgment insofar as it vacated the award of attorney's fees, and remand to the District Court for entry of a judgment confirming the arbitrator's Final Award in its entirety.

27